**Jeannie K. (Morse) LASKOWSKI,
Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner
of Social Security, Defendant.**

No. 99–10036.

United States District Court,
E.D. Michigan,
Northern Division.

April 19, 2000.

Lewis M. Seward, Seward, Tally, Bay City, MI, for plaintiff.

Karen M. Gibbs, U.S. Attorney's Office, Detroit, MI, for defendant.

### OPINION AND ORDER DECLINING TO ADOPT REPORT AND RECOMMENDATION

ROBERTS, District Judge.

### I. *Introduction*

Before the Court are Plaintiff Jeannie K. Laskowski's Objections to Magistrate Judge Charles E. Binder's November 9, 1999 Report and Recommendation that the Court affirm the findings of Defendant Kenneth S. Apfel, Commissioner of Social Security. After a *de novo* review of the record, the Court will decline to adopt the Report and Recommendation and will instead remand this matter to the Commissioner for an award of benefits.

### II. *Background*

#### A. *Medical History*

On April 1, 1993, Plaintiff saw Mark Stewart M.D. for back and leg pain that had begun five years previously. He reported that a myelogram showed two bulging or small herniated discs at L3–4 and L4–5 and stenosis at L4–5 bilaterally (Tr. at 186 & 193). To alleviate her pain, Plaintiff underwent two laminectomy procedures—one on April 14 and the other on April 20, 1993 (Tr. at 191, 193 & 194).

Thereafter, on April 30, 1993, M. Nasr M.D. reported in a Medical Examination Report for the Michigan Department of Social Services that Plaintiff was "unemployable" due to her chronic low back pain (Tr. at 187–188).[1] By July 1, 1993, Dr.

---

1. The Court notes that the terms "employa- ble" and "unemployable" were the choices

Stewart believed that Plaintiff had recovered, was employable and had no limitations (Tr. at 198–199). He was the last physician to render such an opinion.

On October 12, 1993, Dr. Nasr wrote, "Following her surgery she is has [sic] not done well. Continues to have moderate/severe back pain." He felt that her status was deteriorating. With respect to her limitations, Dr. Nasr wrote that Plaintiff could frequently lift or carry 5 lbs, could occasionally lift or carry 6 to 10 lbs and 11–20 pounds, and she could never carry any more weight. He again concluded that Plaintiff was unemployable (Tr. at 202).

The same opinion was made by Dr. Nasr on December 9, 1993. He stated that Plaintiff had not done well since her surgery and continued to have moderate to severe pain. He further reported that a MRI performed on August 27, 1993 showed degenerative changes with bulging disc at L3–4 and L4–5 disc levels (Tr. at 213–214).

A consultive examination was performed on Plaintiff on June 28, 1994 at the request of the Social Security Administration's Disability Determination Service. After his examination of Plaintiff, Gary Jett, M.D. opined that she had probable degenerative disc disease of the lumbosacral spine and was restricted from standing, walking, climbing, bending or lifting greater than 20 lbs (Tr. at 275).

Shortly after her examination by Dr. Jett, Plaintiff was examined by orthopaedic surgeon Gerald Coniglio, M.D. On October 5, 1994, Dr. Coniglio reported that Plaintiff's operation made her worse. "She has trouble sleeping, standings, sit or walk or lie down. Every position bothers her." On physical examination, he found that "[i]t is hard for her to sit still. She has trouble standing.... She foreflexes the foot from the floor with severe pain in the low back and buttocks. Backward extension usually increases pain in the back and buttocks." (Tr. at 281).

Plaintiff last saw Dr. Coniglio on October 24, 1994. However, in a July 7, 1995 letter, he opined that Plaintiff was at least partially disabled. "Physical examination at the time showed significant neuromuscular loss and positive straight leg raising. Myelogram showed a mild broad based disc bulge at L4/5 and this suggests nerve root impidgemnet [sic] phenonema [sic]. The patient is permanently, partially disabled to the degree which I cannot attest to since I have not seen her since October of 1994." (Tr. at 295).

Early 1995 marked the beginning of Plaintiff's treatment of depression. As reported by D.L. Foster M.D., Plaintiff was admitted on an involuntary basis to Bay Medical Center, Bay Haven Chemical Dependency and Mental Health Programs on March 27, 1995. The petition for commitment had been filed by Plaintiff's sister. Plaintiff had been hearing voices. She also believed that her family was endangering her and that doctors were sent by the devil. It was reported that Plaintiff had been playing with a Ouija board for five hours a day (Tr. at 309).

Dr. Foster's admitting diagnosis of Plaintiff was major depression with psychotic features and he assessed her Global Assessment of Function (GAF) to be 35–40.[2] After 7 days of hospitalization, Plain-

---

offered on the Department of Social Service's Medical Examination Report form and, therefore, the indication that Plaintiff was "unemployable" was a medical opinion regarding Plaintiff's ability to work. This notation applies to all opinions of employability cited in this Opinion. In each case, the doctor was completing a standardized State form that gave the physician the choice of indicating whether the Plaintiff was "employable" or "unemployable."

2. A GAF of 31 to 40 means that the patient has "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood...." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND .STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994) (DSM–IV)

tiff was discharged with a diagnosis of major depression with psychotic features and a GAF of 55.[3] Dr. Foster indicated that Plaintiff had responded well to medications and that her voices and delusions disappeared. He concluded, "There are many situational problems which precipitated this particular difficulty and thus the diagnosis may more appropriately seen as a schizioaffective disorder." (Tr. at 309–310).

The "situational problems" that precipitated Plaintiff's depression included the 1985 death of a brother, the 1984 death of her mother and the terminal illness of her boyfriend (Tr. at 310, 317 & 320).

Plaintiff began a partial hospitalization for her psychiatric illness on March 28, 1995 and was discharged on April 17, 1995. The discharge notes indicated that Plaintiff had improved, but she was still diagnosed with severe, recurrent major depression. Her GAF was 65.[4] (312–314)

At the request of treating physicians Jan M. Goldberger and Gavin I. Awerbuch, M.D., Plaintiff underwent an EMG on June 21, 1995. "EMG findings are indicative of right L5 radiculopathy.[5] The EMG findings appear chronic and I see no evidence of active denervation." (Tr. at 293).

In July, 1995, Plaintiff began to treat with psychiatrist Richard Goldner, M.D. and other therapist at the Michigan Psychiatric Associates P.C. She continued to treat with Dr. Goldner and other therapist at his office at least until the January 8, 1998 administrative hearing. After the initial lengthy assessment of Plaintiff, Dr. Goldner diagnosed Plaintiff with major depression with psychotic features and, when indicating Plaintiff's highest level of

adaptive function in last year, assessed her with a GAF 40.[6] (Tr. at 325).

Plaintiff's physical condition also continued to be assessed as poor. In an undated Medical Assessment of Ability to Do Work–Related Activities form, Dr. Goldberger opined that the maximum that Plaintiff could lift was 5 lbs. When asked how many hours in an 8 hour day Plaintiff could stand or walk, Dr. Goldberg wrote, "Sometimes the patient cannot stand at all due to her back pain." Plaintiff could stand without interruption for a total of 15–20 minutes at a time. The amount of hours that Plaintiff could sit in an 8 hour day was "unknown" and without interruption was up to 30 minutes. Plaintiff could never climb, kneel or crawl but could balance, stoop or crouch occasionally. She could reach, handle, see, hear and speak unimpaired but could not feel, push or pull. Restrictions also included working on moving machinery or in temperature extremes, humidity or vibration.

The medical findings that Dr. Goldberger cited to support her assessment were "[d]egenerative disc disease with possible herniated nucleous pulposus. Positive CT scan of 10/11/94 showing a bulging disc at L4–5. Positive EMG showing right L5 radiculopathy. Longstanding lower back pain, which is actually worse since her surgery." Plaintiff was also identified as having arthritis in both hands. Dr. Goldberger concluded, "This patient is unable to work in any type of employment in her present condition due to her constant back pain." (Tr. at 355–356).

Another treating physician opined in a July 19, 1996 Medical Examination Report that Plaintiff was significantly restricted. Carlton Capuson, D.O. diagnosed Plaintiff

---

**3.** A GAF of 51 to 60 means that the patient has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school function." DSM–IV at 32.

**4.** A GAF from 61–70 means that the patient has "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning

pretty well, has some meaningful interpersonal relationships." DSM–IV at 32.

**5.** "Radiculopathy" is "Disease of the spinal nerve roots." STEDMAN'S MEDICAL DICTIONARY 1188 (23rd Ed.1977).

**6.** See note 2.

with chronic back pain, arthritis and depression. The abnormal findings he identified were pain with palpation over lumbar vertebrae and forward flexion limited to 75°. He stated that Plaintiff could sit for 3 hours, could not stand or walk, could never lift or carry any weight up to 10 pounds or more, and could never do simple grasping, reaching or leg controls. Additionally, she could never bend, squat, kneel, crawl, reach above shoulder, work on unprotected heights, work on moving machinery, or work with noise, vibration, extreme temperatures, dust, fumes or gases (Tr. at 409–410).

Kevin Brown, D.O. also found Plaintiff's ability to work limited. Dr. Brown conducted a consultive exam on November 11, 1996 at the request of the Disability Determination Service. His physical examination found that Plaintiff's straight leg raising maneuvers were positive at half range. He found no remarkable lumbar spasm, but did find an abnormal sensory examination in the lower extremities. Plaintiff's heel to toe walking was satisfactory and she was able to squat and recover. Weakness of the ankle dorsiflexors was found on examination. Dr. Brown concluded:

> This lady does have abnormal findings on examination which suggest some ongoing problems following her back surgery. I believe at this time based on her evaluation today that she would have difficulty with repetitive bending or twisting activities. I would not recommend return to work to cleaning activities such as this lady has carried out before. I also think that she needs to be limited to work under 25 pounds. I also believe there may be some question of her being able to sustain work activities for a full 8–hour workday.
>
> I am also uncertain in terms of her history if she is dealing with a major depression. Certainly, the medications she is on would support that she has a significant issue in terms of the type of number of medications. It may also be useful in terms of assessing her disabili-

ty to obtain further information regarding her psychological status.

(Tr. at 377–378).

After examining Plaintiff a second time on September 16, 1997, Dr. Brown did not comment on Plaintiff's ability to work a full 8 hour day. However, it is notable that the physical abnormalities Dr. Brown identified at this second examination were more extensive than during the first one. At the time of the second evaluation, Dr. Brown found that extension, rotation to the left, and side bending of Plaintiff's cervical spine were limited to ½ of expected range. Sensory examination of the upper extremity was diffusely abnormal. Plaintiff could not carry out tandem gait activities and could not squat and recover. Lumbar range of motion was abnormal in that Plaintiff had a forward flexion of 40°, side bending to the left and right of 20° and rotation to the left of 0°. Dr. Brown found mild spasm on both the right and left sides. Straight leg raising maneuvers were positive bilaterally at about 60–70° with referred pain in the back area. Motor examination revealed the presence of bilateral quadriceps weakness (Tr. at 490–491). With the exception of the positive straight leg raising maneuvers, Dr. Brown had made none of these findings at the first examination. Consequently, it is logical to assume that he would still question Plaintiff's ability to work for a full 8 hour day, despite the absence of any comment to that effect.

Dr. Brown did specifically opine that, due to Plaintiff's decreased range of motion and right and left lumbar spasms, she was limited in her ability to lift and carry (no amount of weight specified); limited to standing or walking 1 hour at a time and 2 to 3 hours total out of a day and limited to sitting 1 to 2 hours at a time up to 8 hours per day. He further found that Plaintiff could occasionally perform certain postural activities, such as climbing and balancing. He felt that her physical functions such as reaching and handling were unaffected (Tr. at 493–494).

Returning to Plaintiff's psychiatric condition, Dr. Goldner issued three additional opinions before the administrative hearing. The first, dated November 1, 1996, suggested that Plaintiff's was functioning relatively well. Dr. Goldner opined that Plaintiff's understanding and memory were not significantly limited, that her sustained concentration and adaption were moderately limited and that her social interaction was not significantly limited (Tr. at 375–376).

The second and third evaluation were more consistent with the earlier report from his office. In the June 30, 1997 Psychiatric/Psychological Examination Report, Dr. Goldner indicated that Plaintiff's "[g]eneral information, concentration, abstract thinking and judgment seem to be below normal." Additionally, he diagnosed Plaintiff with schizoaffective disorder, and found that she had a GAF of 45.[7] (Tr. at 475–476).

Dr. Goldner also found Plaintiff to have a GAF of 45 in an extensive December 15, 1997 evaluation. The clinical findings he noted were that Plaintiff had marked emotional liability, cried easily and was emotionally unstable. He stated that Plaintiff was traumatized by intrusive recollections of her brother's death and could not get a good grip on dealing with everyday life due to her emotional liability. Dr. Goldner believed that Plaintiff would be absent from work due to impairment more than three times per month and would have difficulty working at a regular job on a sustained basis. He reasoned:

Has obvious back pain. Unable to work due to a marked emotional liability causing significant problems being able to concentrate and stay focused on tasks. Frequent intrusive thoughts of brother's

death and illness of husband. Needs constant help from relatives to maintain household. Would be unable to focus on any type of work. She has had these problems since we first started treating her on July 14, 1995. Her hallucinations have been controlled by medications but overall, there has been little improvement in her emotional liability.

Dr. Goldner moreover found that Plaintiff had marked restrictions of activities of daily living, marked difficulties maintaining social functioning, frequent deficiencies of concentration, persistence or pace, but no episodes of deterioration or decompensation in a work like setting. For her psychiatric conditions, Plaintiff was prescribed Effexor, Desyrl and Melleril (Tr. at 517–520).

Dr. Capuson issued a final Medical Examination Report before ALJ LaFalce's Decision. In that undated report, he diagnosed Plaintiff with chronic back pain with spondylosis resilient to treatment and depression. Under the section regarding pertinent abnormal findings, Dr. Capuson wrote, "range of motion restricted secondary to pain, paraspinal tenderness to light palpation in the thoracic and lumbar spines, positive SLR 45° at left and 35° at right, L5 radiculopathy and nerve root impingement." The radiologic data Dr. Capuson identified included spinal series x-rays on September 4, 1997 which showed minimal spondylosis[8] and scoliosis,[9] an August 27, 1993 MRI showing degenerative changes with bulging discs at L3–4 and L4–5 and a myelogram on October 14, 1994 showing mild broad-based disc bulge at L4–5 with impingement of the right L5 nerve root. Another diagnostic finding that Dr. Capuson identified was an EMG

---

**7.** A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." DSM–IV at 32.

**8.** "Spondylosis" is "[v]ertebral ankylosis; this term is also often applied nonspecifically to

any lesion of the spine in a degenerative nature." STEDMAN's at 1320. "Ankylosis" is "[s]tiffening or fixation of a joint." STEDMAN's at 82.

**9.** "Scoliosis" is "[l]ateral curvature of the spine." STEDMAN's at 1263.

dated August 24, 1994 showing chronic right L5 radiculopathy.

According to Dr. Capuson, Plaintiff could sit 1 to 2 hours per day, stand 1 hour per day and walk 1 hour per day. She could never lift or carry up to 10 pounds or more due to the above findings and arthritis in her hands. For the same reason, she could not do simple grasping, reaching, pushing, pulling, fine manipulation or operate leg controls on a repetitive basis. She should never bend, kneel, crawl or reach above shoulder and could only squat occasionally because those activities would increase back pain. Plaintiff should never work on unprotected heights, moving machinery or extreme temperature, but could occasionally work with noise and vibration and with dust, fumes and gases (Tr. at 526–527).

Dr. Capuson had prescribed Ultram and Oruvail for Plaintiff's pain and the inflammation associated with arthritis (Tr. at 509 & 526).

### B. *Plaintiff's Hearing Testimony*

After Administrative Law Judge John A. LaFalce's initial decision in this case, the Appeals Council remanded the matter back to him for reconsideration. As a result, Plaintiff had two administrative hearings. The first hearing was on February 15, 1996 and the second was on January 8, 1998.

At the first hearing, Plaintiff testified that she bathed and cared for herself and could do the dishes, but that her sister drove her around and did her house cleaning. In fact, because the State had found Plaintiff's back condition to be disabling, it paid her sister to clean Plaintiff's home. Plaintiff stated that she could not do the house work because it was hard for her to bend and she could not sit or stand for long. She specifically named mopping, laundry and vacuum as activities that she could not do. Plaintiff's sister also took her grocery shopping and Plaintiff would carry only the light items such as bread. Her landlord did the yard work and her son took out the trash for her. (Tr. at 54–55 & 62–63).

During the hearing, ALJ LaFalce referred to a time that Plaintiff had gone to the mall with her sister. Plaintiff stated that the only store she went to at the mall was the Dollar Store. She further testified that she walked her dog around a small block, would walk to the store about 2 blocks away and would walk to her sister's house. However, she did not walk far (Tr. at 55–57).

Regarding her pain, Plaintiff testified that it had worsened since her surgery. Walking and cold weather aggravated the back pain. She did not walk stairs because it hurt her back and legs. Standing and sitting also hurt. She testified that her back starts to hurt after standing 5 minutes and sitting 15 minutes. Plaintiff took the prescription medications of Ultram and Voltaren for her back pain, as well as Extra Strength Tylenol. Additionally, she used a heating pad every night (Tr. at 59–61 & 68–69).

For hobbies, Plaintiff went out once in a while to play Bingo, but did no dancing, shuffleboard or pool playing anymore. She spent most of the day lying down and had thoughts of suicide about once a week (Tr. at 65–66).

At the time of her second hearing, Plaintiff testified that her physical condition had gotten worse. While the pain was mostly in the lower back previously, it had moved to the upper part of the back now (Tr. at 84).

Plaintiff's walking had decreased. She walked to the corner store about a ½ block once in a great while if she ran out of milk or something. A round trip walk to the store took about 20 to 25 minutes. After the first ½ block of walking, the lower part of her back would start to hurt real bad. Also, instead of walking the dog around the block, she now usually just let him go outside on a chain (Tr. at 84–85, 97–98 & 101).

Plaintiff no longer played bingo, went to the mall or to theaters. She would sometimes go shopping with her sister but other times her sister would shop for her. She laid down during the day most of the time. (Tr. at 95–96).

Plaintiff's sister still got paid for doing her housework. Plaintiff did dishes and perhaps a little dusting. That was all (Tr. at 84 & 100).

Plaintiff testified that the pain in lower back was constant. Pain in the upper back came and went. Her back pain radiated into her buttocks and arms and she experienced numbness in her legs, feet, arms, hands and fingers. Plaintiff still took Ultram, which helped sometimes, and wore a back brace (Tr. at 89–93).

With respect to her limitations, Plaintiff testified that she could stand about 10 minutes and sit between 20 and 80 minutes. She still did not walk stairs and could not twist from right to left while standing. Reaching above head aggravated the numbness in her arms. Holding a gallon of milk—which was the heaviest weight she could carry—caused her hands and fingers to get numb (Tr. at 98–99).

Turning to her psychiatric illness, Plaintiff testified that she was then seeing her therapist once a week rather than twice a week, as she had previously. She had daily crying spells (Tr. at 86 & 93).

The Court notes that Plaintiff's Daily Activity Sheets were consistent with her testimony (Tr. at 289–292, 302–307, 505–508 & 511–515).

### C. *Hearing Decision*

In a January 30, 1998 Decision, ALJ LaFalce held that Plaintiff had the severe impairments of lower back pain and depression. However, he also found that Plaintiff retained the residual functional capacity for a restricted range of light and unskilled work. Specifically, he found that Plaintiff could lift up to 20 pounds but no more than 5 pounds with her non-dominant left hand; could stand up to 10 min-

utes at a time; could walk up to 30 minutes at a time; could sit up to 60 minutes at a time; could not engage in excessive twisting, turning or bending; and could perform only simple unskilled routine type jobs which involved 1–2–3 steps (Tr. at 38). In response to a hypothetical consistent with those limitations, a vocational expert testified that there were jobs in the national economy to accommodate those limitations (Tr. at 102–106). Thus, the ALJ found that Plaintiff was not disabled (Tr. at 39).

### III. *Analysis*

■ If supported by substantial evidence, the Commissioner's findings are conclusive. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The decision of the Commissioner must be upheld if supported by substantial evidence, even if the record might support a contrary decision. *Smith v. Secretary of Health and Human Services*, 893 F.2d 106, 108 (6th Cir.1989).

### A. *Magistrate Judge Binder Erred in Finding That the Commissioner's Decision was Supported By Substantial Evidence.*

Magistrate Judge Binder opined that ALJ LaFalce's Decision was supported by substantial evidence. In so opining, Magistrate Judge Binder cited discrete portions of the medical evidence. For example, he referred to the fact that Dr. Goldberger felt that Plaintiff could undertake some lifting and alternate between sitting and standing (Tr. at 355). Yet, Dr. Goldberger also stated that Plaintiff sometimes could not stand at all and that Plaintiff "is unable to work in any type of employment in her present condition due to her constant back pain." (Tr. at 355–356).

Magistrate Judge Binder cited the fact that Herbert J. Roth, Jr. M.D. found that Plaintiff had negative straight leg raising and was neurologically intact in an August 21, 1995 report (Tr. at 359–361). Nevertheless, Drs. Coniglio, Brown and Capuson all found Plaintiff to have positive straight leg raising (Tr. at 295, 377–378, 490–491 and 526–527). Also ignored were the various opinions that Plaintiff suffered from sensory loss, nerve root impingement and L5 radiculopathy (Tr. at 295, 355–356, 377–378, 490–491, 526–527).

Magistrate Judge Binder also cited the fact that Dr. Capuson believed that Plaintiff could sit for 3 hours (Tr. at 409–410). However, Dr. Capuson also believed that Plaintiff was restricted from jobs that required standing or walking, and could not lift even 10 pounds (Tr. at 409–410). Additionally, in a later opinion, Dr. Capuson stated that Plaintiff should not sit for more than 1 to 2 hours per day (Tr. at 526–527).

 Magistrate Judge Binder's approach to finding substantial evidence was erroneous. Substantial evidence cannot be based on fragments of the record.

Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.

*Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir.1984) (citations and quotation marks omitted).

 After a review of the record as a whole, the Court finds that ALJ LaFalce's Decision was not based upon substantial evidence. Indeed, the Court finds his treatment of Plaintiff's case appalling.

### B. *ALJ LaFalce's Review of the Record Was Unfair and Inaccurate.*

ALJ LaFalce Decision included many blatant misrepresentations of the record. He stated that Plaintiff "admitted that she is able to lift five to ten pounds, stand up to ten minutes, and walk and sit up to 30 minutes at a time." (Tr. at 35). In truth, Plaintiff testified that the most she could lift was a gallon of milk and that walking a ½ block caused her pain. As a result, she only took the 25 minute round trip to the corner store once in a great while. He further stated that Plaintiff performs routine household chores (Tr. at 35). The evidence is undisputed that Plaintiff's sister does the bulk of her house work and is paid by the State for those duties. Plaintiff only washes dishes and does a little dusting.

Amazingly, ALJ LaFalce stated, "For enjoyment she plays Bingo, dances, plays shuffleboard and shops." (Tr. at 35). Plaintiff clearly denied dancing and playing shuffleboard. At her first hearing, she testified that she occasionally went out for Bingo, but denied continuing to be able to play it at her second hearing. Furthermore, the little bit of shopping at the Dollar Store and the grocery shopping Plaintiff testified that she does with her sister cannot be considered evidence of Plaintiff's ability to work.

Also incredible is the evidence cited by ALJ LaFalce to state that "the severe complaints alleged by the claimant are not borne out by the evidence." (Tr. at 35). He relied upon the fact that, in July 1993, Dr. Stewart indicated that the Plaintiff had completely recovered from her surgery, had no physical limitations and was fully employable (Tr. at 198–199). As noted earlier, Dr. Stewart was the only doctor to render such an opinion. Even consultive physicians Brown and Jett opined that Plaintiff had limitations. In fact, Dr. Jett stated that Plaintiff was restricted from standing or walking and Dr. Brown questioned her ability "to sustain work activities for a full 8–hour workday." (Tr. at 275 & 377–378).

Additionally, ALJ LaFalce stated that there was no clinical basis for Dr. Capuson's limitations and that his opinion "ap-

peared to be based upon the claimant's subjective complaints which are aimed at acquiring Social Security Benefits." (Tr. at 36). In so stating, ALJ LaFalce completely ignored Dr. Capuson's explanation. Dr. Capuson indicated that his findings were based on Plaintiff's restricted ranges of motion secondary to pain, paraspinal tenderness to light palpation in the thoracic and lumbar spines, positive straight leg testing of 45° at left and 35° at right, L5 radiculopathy and nerve root impingement. Radiologic data supporting his opinion included spinal series x-rays showing minimal spondylosis and scoliosis, a MRI showing degenerative changes with bulging discs at L3–4 and L4–5, and a myelogram showing mild broad-based disc bulge at L4–5 with impingement of the right L5 nerve root. Another diagnostic finding he cited was an EMG dated 8/24/94 showing chronic right L5 radiculopathy (Tr. at 526–527).

The restricted ranges of motion (of both the cervical and lumbar spine), L5 radiculopathy, positive straight leg testing and nerve root impingement were found by other doctors. In addition, other physicians noted Plaintiff's significant neuromuscular weakness, her sensory abnormalities, her bilateral quadriceps weakness, her lumbar muscle spasm, her inability to carry out tandem gait activities and her inability to squat and recover (See Tr. at 295, 377–378, 409–410 & 490–491).

The type of medical evidence cited by Plaintiff's physicians is consistent with that which 20 C.F.R. § 404.1529(c)(2) describes as constituting objective evidence of the intensity and persistence of a claimant's symptoms. "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." Section 1529(c)(2). In view of the plethora of this type of evidence in Plaintiff's record, ALJ LaFalce's statement that there was no clinical basis for Dr. Capuson's opinion is ludicrous.

ALJ LaFalce's reasoning in rejecting Dr. Goldner's opinion regarding Plaintiff's psychiatric limitations is also flawed. ALJ LaFalce stated that Plaintiff's activities of daily living and her social functioning show that she is not as limited as Dr. Goldner alleged. However, as previously noted, ALJ LaFalce falsely described Plaintiff's activities of daily living and social functioning as including normal household chores, dancing, shuffleboard and Bingo. In reality, Plaintiff's testimony and daily activity sheets demonstrate that she does little physical activity, frequently lays down, has daily crying spells and suicidal ideation.

ALJ LaFalce additionally found that Plaintiff's depression was nothing more than situational grief related to the death of her mother and brother and husband's illness. He concluded that her situational grief did would not meet the 12 month duration requirement for a severe impairment set forth in 20 C.F.R. § 416.909. (Tr. at 36). ALJ LaFalce's opinion to this effect makes no sense for two reasons. First, Plaintiff began her psychiatric treatment in March of 1995 and was still receiving such treatment at the time of the January 1998 hearing. Therefore, Plaintiff had already met the 12 month requirement. Furthermore, Plaintiff's mother and brother had died more than a decade before her March 1995 psychiatric hospitalization. The fact that those long ago deaths contributed to her depression negates the idea that that depression was merely short term grief.

ALJ LaFalce stated that Plaintiff "only began seeking psychiatric treatment when she decided she should be collecting Social Security benefits." (Tr. at 36). However, Plaintiff's psychiatric treatment began with her *involuntary* hospitalization. At that time, she was delusional. There is no evidence in the record to support ALJ LaFalce's apparent assumption that Plaintiff's psychiatric treatment is a sham, moti-

vated only by a desire to collect Social Security.

At bottom, ALJ LaFalce's treatment of Plaintiff's claim appears to have been based upon prejudice. He placed undue emphasis on Plaintiff's history of being on governmental assistance:

> The undersigned also notes in passing that the claimant has no work history throughout her adult life. As such, even prior to the claimant's alleged onset date the claimant was not working, preferring to rely on third party support from the federal government and state of Michigan. It does not appear that the claimant is fully motivated towards working and appears to prefer to live off of state provided third party support.

(Tr. at 36). Had ALJ LaFalce's review of the record been fair and accurate and had the record reflected malingering on Plaintiff's part, this statement may not have raised suspicion. However, in light of his poor review of the evidence and the lack of evidence or medical opinion that Plaintiff is a malingerer, the Court can only conclude that prejudice motivated ALJ LaFalce's decision. His decision certainly did not derive from substantial evidence.

### C. *Plaintiff's Treater's Opinions that She is Disabled are Entitled to Deference.*

■ Sixth Circuit authority makes clear that a treating physician's opinion that his or her patient is disabled is given deference if it is supported by objective evidence and uncontradicted by substantial evidence in the record. Such was the holding of *Jones v. Secretary, Health and Human Services*, 945 F.2d 1365, 1370 (6th Cir.1991).

> Here, the other evidence pointed in the other direction, toward a finding of disability. The unanimous opinion of the treating physicians was that she was disabled. There were no contrary medical opinions. [FN7]

> FN7. We note that it is well-settled in this circuit that treating physicians'

opinions, based on objective evidence, should be accorded significant weight. If uncontradicted, the physicians' opinions are entitled to complete deference. *See, e.g., King v. Heckler*, 742 F.2d 968 (6th Cir.1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048 (6th Cir.1983); *Colwell v. Gardner*, 386 F.2d 56 (6th Cir.1967); *Miracle v. Celebrezze*, 351 F.2d 361, 378 (6th Cir.1965); *Hall v. Celebrezze*, 314 F.2d 686 (6th Cir. 1963).

*Also see Hardaway v. Secretary of Health and Human Services*, 823 F.2d 922, 927 (6th Cir.1987) ("Hardaway also claims that the Secretary erred in failing to accord conclusive weight to the opinions of his three treating physicians that he was disabled. The expert opinions of a treating physician as to the existence of a disability are binding on the fact-finder unless contradicted by substantial evidence to the contrary.") (Citation and quotation marks omitted).

In this case, Drs. Nasr and Goldberger opined that Plaintiff was unable to work due to her physical ailments (Tr. at 202, 213–214, 355–356). In addition to other restrictions, Dr. Capuson's opined that Plaintiff could only sit for 1 to 2 hours a day and stand or walk for 1 hour a day (Tr. at 526–527). Accordingly, his restrictions would preclude Plaintiff from working a full 8 hour day. For the reasons previously described in this Opinion, Plaintiff's treating physician's disability opinions are well supported by substantial objective clinical evidence.

There is no substantial evidence that contradicts the treating physicians' opinions that Plaintiff is disabled. Dr. Stewart's opinion, rendered shortly after Plaintiff's 1993 surgery, that she had fully recovered and had no limitations has been discredited by every other physician that has examined Plaintiff. Dr. Coniglio noted that Plaintiff had a hard time sitting still and had trouble standing (Tr. at 281). Although he could not attest to the extent

of Plaintiff's disability, he did opine that Plaintiff was at least permanently and partially disabled (Tr. at 295). Consultive examiner Dr. Brown questioned Plaintiff's ability to work a full 8 hour day and Dr. Jett restricted Plaintiff from standing, walking, climbing or bending (Tr. at 275 & 377–378). In short, the evidence in the record supports rather than detracts from Plaintiff's treaters' opinion that she is disabled. Thus, those opinions are entitled to deference.

Dr. Goldner also opined that Plaintiff is disabled due to her psychiatric illness (Tr. at 517–520). His opinion is supported by his clinical observations of Plaintiff's marked emotional liability, inability to concentrate and stay focused on tasks, slowed motor activity, blunted affect, the ease and frequency with which she cries, below normal abstract thinking and judgment, as well as other observations made during mental status examinations (Tr. at 323–325, 475–476 & 517–519). Such findings from mental status examinations are competent evidence to support a psychiatrist's opinion. *Young v. Secretary of Health & Human Services,* 925 F.2d 146, 151 (6th Cir.1990). *Also see* 20 C.F.R. § 404.1528(c).

Furthermore, there is no substantial evidence in the record to dispute Dr. Goldner's opinion that Plaintiff's emotional liability is disabling. No expert has contradicted Dr. Goldner's opinion and Plaintiff's reported inactivity, daily crying spells and suicidal ideation are consistent with his opinion. In addition, the longevity and frequency of her psychiatric treatment lend support to Dr. Goldner's opinion that her symptoms are marked.

Since Dr. Goldner's opinion regarding Plaintiff's psychiatric disability is supported by objective clinical findings and is consistent with the record as a whole, his opinion is entitled to deference.

## IV. *Conclusion*

The Court finds that there are no factual issues that remain unresolved, that the proof of disability is strong and that significant evidence to the contrary is lacking. Accordingly, a remand for benefits is warranted. *Felisky v. Bowen,* 35 F.3d 1027, 1041 (6th Cir.1994).

**THE COURT HEREBY DECLINES TO ADOPT** Magistrate Judge Binder's Report and Recommendation [**document 19**], **GRANTS** Plaintiff's Motion for Summary Judgment [**document 12**], **DENIES** the Commissioner's Motion for Summary Judgment [**document 16**], and **RE-MANDS** this matter for an award of benefits.