Earl F. EASTMAN, III, Plaintiff,

v.

Jo Anne B. BARNHART Commissioner
Social Security Administration.,
Defendant,

No. 3:01 CV 795(GLG).

United States District Court,
D. Connecticut.

Jan. 23, 2003.

Allan B. Rubenstein, New Haven, CT, for Plaintiff.

Ann M. Nevins, U.S. Attorney's Office, Bridgeport, CT, for Defendant.

## MEMORANDUM DECISION

GOETTEL, District Judge.

The claimant, Earl F. Eastman, II, pursuant to 205(g) of the Social Security Act (SSA), 42 U.S.C. § 405(g), brings this action against the Commissioner of the Social Security Administration seeking judicial review of the Commissioner's denial of his application for Disability Insurance Benefits (DIB) and for Supplemental Security Income Disability Benefits (SSI). *See* 42 U.S.C. §§ 416, 423 and 1383(c)(3). The claimant has moved for an order reversing the Commissioner's decision, or in the alternative, to remand the case to the Commissioner for a new hearing [**Doc.# 7**]. Conversely, the Commissioner has moved for an order affirming her decision [**Doc. # 11**]. We affirm the Commissioner's judgment.

## I. PROCEDURAL HISTORY

On March 24, 1997, the claimant filed an application for DIB; he filed also an application for SSI benefits on June 4, 1997. The Social Security Administration denied the claims initially and also on reconsideration. On August 14, 1998, the claimant filed a request for a hearing before an Administrative Law Judge (ALJ). A hearing took place on November 18, 1998; a supplemental hearing occurred on June 25, 1999. The ALJ issued his decision on April 14, 2000, wherein he denied the claimant's application for DIB and SSI benefits. Subsequently, the claimant requested review of the ALJ's decision before the Appeals Council. After an Appeals Council review, the claimant's application was denied, thereby rendering the ALJ's decision the final decision of the Commissioner. The claimant's appeal of that decision is now before this Court. The following facts are relevant to this appeal.

## II. STATEMENT OF FACTS

The claimant was born on January 8, 1945. He is a high school graduate. Following high school, he spent four years in

the military with the Air Force. During thirteen months of that time, the claimant served in Vietnam where he maintained pavement necessary for the operations of various aircraft. Though the claimant related in his testimony that he has had roughly forty different jobs throughout his lifetime, his past relevant work experience includes employment as a lumber yard wood-cutter, loading dock worker, exterminator and restaurant worker.

On July 15, 1995, the claimant suffered a work-related injury. Though he worked for a short time following the injury, he has not engaged in substantial gainful activity since September, 1995.

### A. Medical Evidence

Several doctors have examined the claimant for either treatment or consultative purposes regarding his physical and mental status since his injury in 1995. Additionally, two medical experts testified at the hearings and made conclusions regarding the claimant's medical status based on their examination of his medical records. We set forth now the findings of each doctor.

### 1. Chiropractic Findings

When the claimant was injured in 1995, he sought the attention of the Carpenos Chiropractic Center. There, two doctors treated him: Dr. Carpenos and Dr. Wilson. Dr. Carpenos first examined the claimant on September 28, 1995. At that time, he diagnosed him with cervicobrachial syndrome, cervical sprain/strain and cervical neuritis. Dr. Carpenos noted in his report of October 19, 1995 that all of

the claimant's "active range of motion and passive range of motion caused a great deal of pain and severe bilateral spasm throughout the cervicodorsal musculature." Administrative Record at 249.[1]  In a letter dated October 27, 1995, Dr. Carpenos stated that the claimant "is unable to work even at light duty at this time." R. at 251. In December, 1995, he requested a computerized axial tomography scan (CT scan) of the claimant's cervical spine to rule out "possible cervical or upper thoracic disc herniation." R. at 252. Based on the CT scan, Dr. Carpenos stated that it verified the claimant's injury as "a right moderate ventral disc herniation at C6/C7 vertebral motor junction which was shown to be compressing the thecal sac on the right. These findings are diagnostic in itself." R. at 261.

The claimant's final examination at the Carpenos Chiropractic Center occurred on June 12, 1996. Dr. Wilson reported on that examination and stated, the claimant

> can not physically return to his previous occupation as a laborer. Any attempt to return this patient to manual labor work will aggravate his current condition and cause further injury to his cervical spine. Further employment considerations if applicable must be restricted to clerical or sedentary tasks. Future work restrictions must be limited to but not include lifting in excess of 15 lbs., lifting should largely be from waist height to shoulder height on occasion, refrain from lifting over shoulder more than rarely and should avoid climbing or crawling.[2] Repetitive bending should be

---

1. All citations to the administrative record will be signified with an "R" followed by a page number.

2. Sedentary work, in part, "involves lifting no more than [ten] pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools . . . ." 20 C.F.R. § 404.1567(a) (2002). Subsection (b) defines light work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . . ." Subsection (c) defines medium work as "lifting no more than 50 pounds at a time with frequent

done occasionally. It is my opinion taking into consideration [the claimant's] future employability that vocational rehabilitation is warranted in this matter. It is my opinion that he can not return to the kind of work that he was performing when he sustained this injury on July 1, 1995. If [the claimant] is allowed to return to the type of work that he was performing prior to this injury there is a high probability of permanent risk of re-injury to his cervical spine which would inevitably lead to permanent disability from all forms of working.

R. at 269.

### 2. Dr. Arkins' Findings

Dr. Arkins, a neurosurgeon, conducted an independent neurological examination of the claimant in May, 1996. He found the claimant to have "a cervicothoracic sprain and a mild right thoracic outlet syndrome." R. at 242. He anticipated the claimant would have a permanent impairment rating of fifteen percent of the spine due to those conditions, and that he had reached maximal medical improvement. Dr. Arkins did, however, state that the claimant may return to work with some limitations. He recommended that the claimant lift no more than twenty-five pounds from waist to shoulder height on occasion and only rarely from over shoulder height, and avoid climbing or crawling.[3] Dr. Arkins was not of the opinion that the claimant's condition required further testing, such as a magnetic resonance image (MRI) scan. R. at 242, 243.

### 3. Dr. Salman's Findings

Dr. Salman, a psychologist, performed a psychological evaluation of the claimant on

June 2, 1997. He found the claimant to be fully alert and able to speak "in a clear, coherent, relevant and fully intelligible manner. . . . The claimant's primary allegation for disability relates to self-reported difficulties performing physical activities of daily living for any prolonged period of time associated with a possible long standing cervical disc injury." Dr. Salman concluded, "[t]he claimant presents no signs of symptoms associated with a serious psychiatric or mental condition." R. at 275–278.

### 4. Dr. Guarnaccia's Findings

Dr. Guarnaccia, an independent consulting physician, performed a physical examination of the claimant in June, 1997. He found the claimant to be a "well-developed, well-nourished male in no distress." R. at 292. Dr. Guarnaccia reported that the claimant did not suffer from any muscle atrophy and that manipulation of his hands was normal; he noted the claimant's shoulders to have a full range of motion, despite the fact that the claimant said such movement "bothered him." He found further that the claimant could "stand and walk on his toes and heels, balance on his right and left leg, and stand from a squatting position without difficulty." R. at 292. Dr. Guarnaccia concluded, "[t]here are no focal neurological or cardiac findings." R. at 292.

### 5. Dr. Syed's Findings

Dr. Syed, a consulting psychiatrist, performed a psychological examination of the claimant on March 7, 1998. He recorded the claimant's history in his report as the claimant described it to him. Dr. Syed

---

lifting or carrying objects weighing up to 25 pounds. . . ."

**3.** The limitations that Dr. Arkins recommended fall between the light work and medium work categories as listed in 20 C.F.R. § 404.1567. *See supra* note 2.

stated, "[the claimant] does seem to have insight into his problems" and he felt the claimant "was reliable in the account that he gave." R. at 304. Dr. Syed's opinion is that the claimant "has a combination of both depression and anxiety." R. at 304. He reported the claimant exhibited "psychomotor overactivity" and had suicidal, but not homicidal, thoughts. R. at 304. He noted further that the claimant was "agitated and anxious," as well as "tense and apprehensive at times." R. at 304. He diagnosed the claimant to be suffering from (1) major depression, which is recurrent and continuous and of a high moderate intensity, (2) attention deficit hyperactivity disorder, (3) status post injury to the neck with physical limitations and chronic pain, (4) moderate stress due to physical and social status and (5) a Global Assessment of Functioning [4] (GAF) of about thirty-five to forty.[5] *Id.*

### 6. Dr. Raccuglia's Findings

Dr. Raccuglia, an internist, performed two examinations on the claimant for the purpose of determining his disability, if any. He conducted his first examination on April 15, 1998. His examination of the claimant's neck revealed he was able to "turn his head [sixty] degrees bilaterally," extend and flex his head fifty degrees and tilt it twenty degrees bilaterally. R. at 319. Dr. Raccuglia determined that the claimant's complaints of neck and leg pain could not be substantiated by his examination.

Dr. Raccuglia's second examination of the claimant occurred on August 16, 1999. He reported, "[t]he examination of the area of complaint showed that the [claimant] could turn his head [forty-five] degrees bilaterally on active movement and [seventy] degrees with passive movement." R. at 370. The claimant complained of pain with the passive movement of his head. Dr. Raccuglia noted further, the claimant "could flex his head to touch his chest with his chin. . . . [T]he joints of both shoulders showed minimal crepitation on the right and a moderate crepitation on the left." R. at 370. The right arm had a full range of motion, but movement of the left shoulder was limited due to pain and could be extended only to ninety degrees. The claimant's legs, arms and hands were found to be of normal strength and sensitivity. Further, he reported that the claimant had "subjective complaints of pain in the neck, right shoulder and in the knees, [but that] [t]here were no objective findings in the knees. There was minimal crepitation in the movement of the shoulder with a decrease of the range of motion in the left side. . . . The neurological examination was entirely within normal limits" and the claimant did not display any symptoms of depression. R. at 370–371.

In addition to his written report regarding his August 16, 1999 examination of the claimant, Dr. Raccuglia filled out a form describing the claimant's ability to perform work-related activities on a day-to-day ba-

---

4. Global Assessment of Functioning "ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death)." *Wesley v. Commissioner of Soc. Sec.*, 205 F.3d 1343, 2000 WL 191664, *3 (6th Cir.2001) (citation omitted); *see also* AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30.

5. A GAF of 31 to 40 means that the patient has "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." *Laskowski v. Apfel*, 100 F.Supp.2d 474, 476, 477 n. 2 (E.D.Mich.2000); AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed. 1994) (DSM–IV).

sis. He noted that the claimant was limited to carrying or lifting ten pounds for one third of an eight hour work day.[6] Additionally, one of the questions on the form asked, "Are STANDING/WALKING affected by impairment?" Rec. at 372. Dr. Raccuglia checked the "No" answer box to this question. In response to a follow-up question in that regard, he stated the claimant can stand and or walk for a total of four hours per day and without interruption for one hour. The final question in this regard asked, "What are the medical findings that support this assessment?" Dr. Raccuglia answered, "No objective evidence of anatomic changes." R. at 372.

### 7. Dr. Martel's Findings

Dr. Martel, clinical psychologist, examined the claimant on August 17, 1999. Dr. Martel found the claimant's Internal Quotient to be ninety-two. He reported that the claimant "displayed rather even capabilities across the verbal range." R. at 377. Dr. Martel found further that the claimant's learning capabilities are preserved, his social judgment average and his reasoning capabilities consistent with his educational level. In his opinion, he found the claimant to be emotionally stable and functioning at an intellectual level consistent with his educational and vocational background, but that there might be "some characterological issues which have impeded his functioning over a long period of time." R. at 379.

### 8. Dr. Kellsey's Findings

Dr. Kellsey, an orthopedic surgeon, testified as a medical expert at the first hearing. His examination of the record revealed that there was no indication of any clinical evidence of neurological deficits. He stated also that the CT scan ordered by Dr. Carpenos, which indicated a possible disc herniation, was, at the least, questionable in the absence of clinical findings and the fact that the claimant's treatment has remained conservative instead of aggressive. Dr. Kellsey was reluctant to opine whether he felt the claimant met or equaled an impairment in the Listings based solely on the chiropractic reports because the record contained no recent orthopedic examinations. Consequently, the ALJ ordered a complete orthopedic examination and psychological evaluation of the claimant. Those exams, however, were never performed, and the second hearing commenced without that information.

### 9. Dr. Fuess' Findings

Dr. Fuess, a clinical psychologist, testified as an expert at the second hearing. He related, based on the reports of Dr. Salman and Dr. Syed, which involved psychiatric and psychological assessments, that the claimant's psychological condition was "more of an adjustment disorder with mixed features [of] depression and anxiety." R. at 100. He characterized the claimant's condition as "mild to moderate in severity" but not a "marked impairment." R. at 100.

### B. Claimant's Testimony

The claimant also testified at the hearing. He described the circumstances of his injury by relating that, while moving a wood beam at work, he felt "a little pop" in his neck near the top of his right shoulder. At first, he was unaware of the severity of his injury because the pain was not "too bad." Consequently, he continued working that day. As time passed, however, the pain worsened, which resulted in the claimant visiting the Orange Walk-in Medical Center for examination. While there,

6. *See supra* note 2.

the staff took x-ray's of the complaint area. The examination, however, did not reveal any injury. R. at 45. Soon thereafter, the claimant explained how he began to feel a lot physical pain and lost strength in his left hand, which foreclosed his ability to do any lifting. He subsequently stopped working and began treatment at the Carpenos Chiropractic Center. The claimant received Workers' Compensation benefits for roughly one year after he stopped working.

The claimant described that his injury caused him to experience "pins and needles" in his hands when he woke up in the morning, as well as numbness on the outside of this right thigh and tingling in both of his feet. He related further that he experiences pain from the base of his neck to his right shoulder, which travels down the inside of both of his arms to the back of his thumbs at the base of his wrists. R. at 48. This pain fluctuates in severity at times. For instance, when the weather is inclement, such as when it rains, is damp or cold, the pain worsens. To alleviate this pain, the claimant takes hot showers, runs his hands under hot water and applies a hot towel to his neck. He does not take any prescription medications.

As a result of his condition, the claimant stated that he is unable to "do things around the house" because of the discomfort he experiences. He stated further that his condition limits his ability to walk certain distances or stand or sit for long periods of time. R. at 49. Specifically, he described how he sits in a reclining chair

for roughly four hours a day: two hours in the morning and two hours in the afternoon. His ability to sit for such a period of time is aided by numerous position changes and the placement of several pillows around his body. Overall, the claimant stated that he "has some good days, and some bad days." R. at 53.

## C. The ALJ's Findings

The ALJ found, "[t]he medical evidence establishes that the claimant has a severe impairment due to a small C5/6 disc protrusion and mild degenerative disc bulging at C4/5 and C3/4 with chronic pain syndrome and mild degenerative joint disease of the left knee, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed" in Appendix 1 to Subpart P. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 435–520 (2002); Rec. at 18. Further, the ALJ concluded that the evidence supports impairments that limit the claimant "only to the extent of intermittent back, leg and upper extremity discomfort, [that] restrict him to a full range of the medium exertional level." R. at 12. Therefore, he determined that the claimant had a Residual Functional Capacity (RFC) [7] allowing him to perform at the medium work level.

The ALJ explained that in making his determination, he discredited the chiropractic findings because they were inconsistent with the overall evidence of the record. The ALJ also discredited the claimant's testimony in regard to the severity of his injury because there were

---

**7.** " 'Residual functional capacity' refers to what a claimant can still do in a work setting despite [his] functional limitations and restrictions caused by [his] medically determinable physical or mental impairments. RFC is assessed by adjudicators at each level of the administrative review process based on all of the relevant evidence in the case record, including information about the individ-

ual's symptoms and any 'medical source statements'—i.e.. opinions about what that individual can still do despite his severe impairment or impairments—submitted by that individual's treating sources or other acceptable sources. SSR 96–9 P, 1996 WL 374185, at *1; *see* 20 C.F.R. § 404.1545." *Horbock v. Barnhart,* 210 F.Supp.2d 125, 127 n. 3 (D.Conn.2002).

"too many inconsistencies in the record" that could not be squared with the overall medical evidence. R. at 17. Moreover, the ALJ noted, "all examinations fail to document any significant neurological deficits which undermine[s] [the claimant's] credibility as to allegations of persistent and incapacitating neck and shoulder pain radiating into the arm and hand." R. at 17.

## III. DISCUSSION

Having set forth the relevant facts, we reach now the merits of the claimant's appeal. On appeal, the claimant challenges the ALJ's determination that his RFC allowed him to perform past relevant work as a restaurant worker or exterminator at the medium exertion level and is, therefore, not disabled within the meaning of the SSA. Specifically, the claimant argues that there is "no evidence in the record" to support the ALJ's decision and that all of the evidence is to the contrary. Pl.'s Mem. at. 18. Further, the claimant argues that the ALJ failed to follow Social Security Rulings 96–8P [8] and 95–5P [9] because he did not consider the relevant factors in those rulings, failed to include a "discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence," as 96–8P requires, and acted as his own medical expert in contravention of law. We disagree.

Before setting forth our standard of review, we address first the claimant's argument that ALJ "failed to follow the treating source rule in the Regulations and ignored the treating source's opinion" and, because the ALJ did not accord the claimant's alleged treating source controlling weight, the Regulations required him to apply certain factors in determining the weight of such evidence. Pl.'s Mem. at 30; *see also* 20 C.F.R. § 404.1527(d)(1) and (2) (discussing weight of medical evidence). We disagree, and note that the claimant's argument borders on frivolous because it completely ignores existing law. *See* Fed. R.Civ.P. 11(b)(2).

■ The Regulations set forth what has been termed the "treating source" or "treating physician" rule. This provision is entitled *"Treatment relationship"* and is part of the subsection entitled *"How we weigh medical opinions."* It provides in relevant part: "If we find that a *treating source's opinion* on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it *controlling weight.*" 20 C.F.R. § 404.1527(d)(2) (emphasis added); *see Diaz v. Shalala,* 59 F.3d 307, 312, 313 (2d Cir.1995) (discussing the "treating physician" rule). The Regulations list further certain factors that the ALJ is to consider in determining the weight of treating source evidence provided he decides not to accord that evidence controlling weight. *See* 20 C.F.R. § 404.1527(d)(2).

■ The Second Circuit ruled unequivocally in *Diaz* that chiropractors cannot give medical opinions under the Regula-

---

**8.** SSR 96–8P provides in relevant part: "Ordinarily, an RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, and an equivalent work schedule."

**9.** SSR 95–5P concerns assessing the claimant's credibility and subjective complaints of pain and other symptoms in the disability determination process.

tions because they are not classified as either physicians or "other acceptable medical sources." *Diaz,* 59 F.3d at 313. Moreover, "it would be inconsistent with the regulations to require the [ALJ] to give controlling weight to a chiropractor's opinion." *Id.* at 314. Consequently, it is within the discretion of the ALJ to accord a chiropractor's opinion whatever weight he deems appropriate "based on all the evidence before him; under no circumstances can the regulations be read to require the ALJ to give controlling weight to a chiropractor's opinion." *Id.* at 313.

■ Having determined, according to *Diaz,* that chiropractic findings are not medical opinions under the Regulations and, therefore, could not be entitled to controlling weight, we look now to see if the ALJ's findings are supported by substantial evidence. We note also that because the claimant challenges the ALJ's findings in step four of the sequential five-step disability-determination, our review of the record is confined to his conclusions in that regard.[10]

### A. Standard of Review

We set forth first the legal principles that govern our resolution of the claimant's appeal.

We review the Commissioner's decision to determine whether it is supported by substantial evidence. 42 U.S.C. § 405(g); *Diaz v. Shalala,* 59 F.3d 307, 314 (2d Cir.1995). 'Substantial evidence' is less than a preponderance, but **more than a mere scintilla. It has been quantified as such evidence as a 'reasonable mind might accept as adequate to support a conclusion.'** *Richardson v. Perales,* 402 U.S. 389, 401, 91

S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir. 2000); *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996). Under this standard, **absent an error of** law, this Court will uphold the Commissioner's decision if it is supported by substantial evidence even if this Court might have ruled differently were we to have made the initial decision. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982), *cert. denied,* 459 U.S. 1212, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983); *see generally Hon. Thomas P. Smith & Patrick M. Fahey, Some Points on Litigating Title II and Title XVI Social Security Disability Claims in United States District Court,* 14 Quinnipiac L.Rev. 243, 249 (Summer 1994).

*Gagnon v. Barnhart,* 210 F.Supp.2d 111, 118, 119 (D.Conn.2002).

For an individual to be considered "disabled" under the SSA he must have an inability to perform any substantial gainful work resulting from a physical or mental condition which can be expected to result in death or which can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The individual's disability must not only render him unable to perform his previous work, but he must be unable, considering his age, education, and work experience, to engage in any other kind of substantial gainful employment which exists in the national economy regardless of whether such work exists in the immediate area of which he lives, or whether a specific job exists for him, or whether he would be hired if he applied for work. 42 U.S.C. § 423(d)(2)(A). Employment exists in the national economy if it "exists in significant

---

10. The claimant asserts also an argument based on *Carroll v. Secretary of Health and Human Services,* 705 F.2d 638 (2d Cir.1983), which concerns an ALJ's determinations in the fifth step of the sequential disability determination process. Because the ALJ never reached that step, we decline to address the claimant's argument in that regard.

numbers either in the region where the individual lives or in several regions of the country." *Id.*

According to the Social Security Regulations (Regulations), a person's claim of disability is evaluated through a sequential five-step process. *See* 20 C.F.R. § 404.1520; *see also Gagnon,* 210 F.Supp.2d at 119. If the claimant is doing substantial gainful activity, the inquiry ends because the claimant is found not to be disabled. If the claimant is not doing substantial gainful activity, the ALJ must determine if he suffers from a severe mental or physical impairment; if none exists, the claim is denied. 20 C.F.R. § 404.1520(c). If the ALJ finds such a severe impairment to exist, the third step is to compare the claimant's impairment with those listed in Appendix 1 (the listings) of the Regulations. If the claimant's impairment meets or equals one of the impairments in the listings, the claimant is automatically considered disabled. 20 C.F.R. § 404.1520(d). If the ALJ finds the claimant's impairment does not meet or equal any of those in the listings, the ALJ proceeds to a forth step. Here, the ALJ determines if the claimant has the RFC to perform his past relevant work; it is the claimant's burden to show otherwise. 20 C.F.R. § 404.1520(e). If the claimant shows that he is unable to perform his past relevant work, the burden shifts to the Commissioner, in step five, to show that there are other jobs existing in significant numbers in the national economy that he can perform consistent with his RFC, age, education and work experience. 20 C.F.R. §§ 404.1520(f) and 404.1566; *Carroll v. Secretary of Health and Human Services,* 705 F.2d 638 (2d Cir.1983); *Gagnon,* 210 F.Supp.2d at 119, 120; *Horbock,* 210 F.Supp.2d at 127 n. 3. Having set forth our standard of review, we determine now whether the ALJ's decision is supported by substantial evidence.

▉ In this case, several doctors examined the claimant and two experts testified at the hearings. The overall evidence of the record shows that the ALJ's decision is supported by substantial evidence, as we now discuss.

Dr. Guarnaccia explicitly found that "[t]here [were] no focal neurological or cardiac findings" evincing the claimant's complaints of injury. Dr. Arkins' recommendation that the claimant's future employment should be subject to certain exertional limitations is offset by the fact that he did not think the claimant's injuries were of such a severity as to require further testing, such as a magnetic resonance image of the complaint area. Moreover, his physical examination did not reveal any significant abnormalities.

Dr. Raccuglia determined that his examination of the claimant did not substantiate his complaints of neck and leg pain. His conclusions based on his second examination of the claimant were consistent with the findings from his first examination in that he found no objective evidence supporting the claimant's complaints of pain and that the "neurological examination was entirely within normal limits." Moreover, Dr. Raccuglia noted that the claimant did not display any symptoms of depression.

There is, however, some inconsistency in Dr. Raccuglia's report. He stated in the document describing the claimant's ability to perform work related activities on a day-to-day basis as being limited to sedentary work. This report was based solely on the claimant's subjective complaints and is not supported by Dr. Raccuglia's findings that there were no significant neurological deficits revealed by his physical examinations of the claimant, as well as no objective medical evidence to substantiate his complaints of neck and leg pain. Consequently, the ALJ discredited Dr. Rac-

cuglia's finding in that regard because it was inconsistent with his own medical findings, as well as other substantial evidence.

Dr. Kellsey testified as a medical expert at the first hearing. His examination of the record revealed that there was no clinical evidence to show that the claimant suffered from any neurological deficits.. He stated further that the CT scan Dr. Carpenos requested and subsequently relied upon to substantiate his diagnosis that the claimant had a C6/C7 herniated disc was inaccurate due to the absence of clinical findings in that regard, as well as the treatment the claimant received.

Dr. Martel, reporting on the claimants mental condition, explicitly stated that the claimant was functioning at a level consistent with his educational and vocational background. Moreover, he found no indicia of a severe mental impairment.

Conversely, Dr. Syed diagnosed the claimant to be suffering from severe depression. His findings, however, were inconsistent with other substantial medical evidence of his mental status. For example, there is only one recorded instance when the claimant complained of or received treatment for depression, which was in 1998. And, other than the claimant's testimony and Dr. Syed's diagnosis, which was inconsistent with other substantial evidence, the medical evidence shows that the claimant was not suffering from a severe mental impairment during the time period in question.

This was substantiated by Dr., Fuess' testimony at the second hearing. He testified that the claimant's mental condition was not as serious as Dr. Syed found. In fact, he stated that the claimant's mental condition did not constitute a "marked impairment." Moreover, the ALJ aptly noted that a mental status examination revealed "no signs or symptoms nor stated complaints consistent with a major affec-

tive disorder or clinical depression." R. at 16. The ALJ, therefore, found Dr. Syed's diagnosis to be inconsistent with the overall evidence of the record. Consequently, he gave it little weight in his determination of disability.

The claimant's chiropractor, Dr. Carpenos, found him to be unable to perform even light duty work. This finding was inconsistent with the finding of his colleague, Dr. Wilson, who found the claimant able to perform light duty work. The ALJ considered this evidence and found it not credible because of that inconsistency and because it was at odds with other substantial evidence of the overall record. For example, it was never recommended to the claimant, nor did he seek, the treatment of an orthopedist. As prescribed, his treatment has been only conservative in nature. Moreover, the claimant takes only over the counter medications to alleviate his pain. *See Diaz*, 59 F.3d at 314 (considering the claimant's taking of over the counter medication as evidence of severity of condition).

Contrary to the claimant's assertion, the ALJ's decision reflects that he considered the plaintiff's subjective complaints, to the extent to which he found them credible, and he also reviewed all of the medical evidence. Based on these factors, the ALJ determined the claimant's exertional capacity to be restricted to "the full range of the medium exertional level." R. at 13. In considering the claimant's non-exertional capacity, the ALJ considered the overall medical evidence and found that it squarely contradicted his subjective complaints of a severe mental impairment, as well as Dr. Syed's opinion as to his mental status. Consequently, the ALJ found any such mental condition to be "non-severe" in nature and, therefore, rendered absent any non-exertional limitations that might have reduced his capacity to perform at the medium exertional level.

Additionally, the ALJ discussed why asserted functional limitations and restrictions cannot reasonably be accepted as consistent with the medical and other evidence. For instance, the ALJ found the claimant's complaints regarding the severity of his condition to lack credibility because they were contrary to other substantial medical evidence, and contrary to his treatment to that date. He also discredited the chiropractic findings because they were internally inconsistent, as well as inconsistent with the overall evidence. The ALJ also discredited Dr. Syed's medical opinion because it sharply contradicted other substantial medical evidence. In this discussion, the ALJ properly explained why such evidence could not "reasonably be accepted as consistent with the medical and other evidence." R. at 12–15.

Because there exists more than a mere scintilla of evidence that a **"reasonable mind might accept as adequate to support" the ALJ's conclusions that the claimant is able to perform his past relevant work as an exterminator or restaurant worker because he** possesses an RFC enabling him to work at the medium exertional level, such conclusions are supported by substantial evidence. See *Perales*, 402 U.S. at 401, 91 S.Ct. 1420; *Curry*, 209 F.3d at 122; *Pratts*, 94 F.3d at 37. Moreover, the ALJ made no error of law in reaching his decision because he properly considered and applied all relevant Social Security Regulations and Rulings. *See Rutherford*, 685 F.2d at 62.

**B.  Other Claims**

██  The claimant argues next that the ALJ improperly discredited his testimony. A claimant's testimony concerning pain is subject to the following standard:

An individual's statement as to pain and other symptoms shall not alone be conclusive of disability as defined in this section; there must be medical signs and findings, established medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to provide the pain and other symptoms alleged and which, when considered with all the evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.

42 U.S.C. § 423(d)(5)(A); *see* 20 C.F.R. §§ 404.1529 and 416.929.

The ALJ considered the claimant's subjective complaints, as he is required to do. He found explicitly that even though the claimant has some discomfort in his neck, shoulders and legs, his testimony as to the degree of his discomfort lacked credibility. The ALJ found the claimant's testimony not credible because it conflicted with the actual treatment of his condition and the medical evidence. Such a determination was well within the discretion of the ALJ. See *Pardilla v. Apfel*, 2000 WL 145463, *5, 6 (S.D.N.Y. Feb. 9, 2000); *Romano v. Apfel*, 2001 WL 199412, *6 (S.D.N.Y. Feb. 26, 2001).

**IV.  CONCLUSION**

We find the ALJ's decision to be supported by substantial evidence. Further, we find the claimant's other arguments unconvincing. Consequently, the claimant's motion seeking reversal of the Commissioner's decision, or in the alternative, to remand the case to her for a new hearing [**Doc.# 7**], is **DENIED**, and the Com-

172

missioner's motion seeking to affirm her decision [**Doc.# 11**], is **GRANTED**.

The Clerk is hereby directed to enter judgment accordingly.

SO ORDERED