**Alan GAGNON, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner, Social Security Administration, Defendant.**

**No. 3:01CV1195(GLG).**

United States District Court, D. Connecticut.

July 1, 2002.

Allan B. Rubenstein, New Haven, CT, for plaintiff.

Ann M. Nevins, U.S. Attorney's Office, Bridgeport, CT, for defendant.

### OPINION

GOETTEL, District Judge.

This action is brought pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security denying plaintiff's application for a period of disability and disability insurance benefits ("DIB") under § 216 and § 223 of the Social Security Act, 42 U.S.C. §§ 416, 423. Plaintiff has moved for an order reversing the decision of the Commissioner [Doc. # 9], and defendant has moved for an order affirming the decision of the Commissioner [Doc. # 12]. For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence and, thus, affirms that decision.

### I. Procedural History

On February 28, 1997, plaintiff filed his application for DIB, alleging that he had been unable to perform substantial gainful employment due to his arthritis since August 11, 1992.[1] (Tr. 87–93.)[2] On April 10, 1997, his application was denied on the ground that his arthritis did not prevent him from doing other work than his past job. (Tr. 61–64.) Plaintiff requested reconsideration of his claim. (Tr. 65–67.) Upon reconsideration, the earlier decision was upheld. (Tr. 68–71.) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 72–73.) A hearing was held on May 11, 1998, in New Haven, Connecticut, at which plaintiff, represented by counsel, appeared and testified, as did an impartial vocational expert. (Tr. 28–56.) On June 26, 1998, the ALJ issued his decision, concluding that, although plaintiff was unable to return to his former employment, he could make an adjustment to other work which exists in significant numbers in the national economy. (Tr. 15–23.) Therefore, the ALJ concluded that plaintiff was not under a disability on December 31, 1997, the date plaintiff's insured status expired.[3] (Tr. 23.) Plaintiff then requested a review of the ALJ's hearing decision. (Tr. 13—14.) After a review of the record, the Appeals Council denied his request for review by letter dated May 18, 2001. (Tr. 7—8.) Plaintiff then filed the instant action appealing this final administrative decision.

### II. Statement of Facts

#### A. Age, Education and Work History

Plaintiff was born on December 12, 1950, and attended two years of photogra-

---

1. Plaintiff had previously filed an application for DIB, which he withdrew after it was denied by the ALJ and the Appeals Council denied his request for review. (Tr. 18, 57.)

2. "Tr." refers to the transcript of the entire record of proceedings filed in this case by the Social Security Administration.

3. Plaintiff had sufficient quarters of coverage to remain insured only through December 31, 1997, and thus, he had to demonstrate that he was under a disability on or before that date. (Tr. 18.)

phy school following high school. (Tr. 38.) He worked for three years as a grounds keeper at a cemetery and for eleven years as a custodian at a public library. (Tr. 35–36.) Plaintiff last worked as a custodian in August 1992, when he reportedly injured both knees. (Tr. 36.) Plaintiff received workers' compensation benefits for about a year and then was cleared for light work. (Tr. 37.) However, plaintiff has not worked since 1992.

## B. The Medical Evidence

### 1. Plaintiff's Knee Problems— 1992–1994

Plaintiff was first treated by Dr. John Aversa, an orthopedic surgeon, on May 18, 1992, for pain in his right knee. (Tr. 153.) On physical examination, Dr. Aversa noted "severe crepitation with clunking in the right knee" and a "patellofemoral syndrome, probably traumatic chondromalacia"[4] related to an injury from 15 years ago when a tombstone fell on his right knee. (Tr. 153.) Dr. Aversa prescribed Naprosyn and Darvocet and told plaintiff to use a cane in his left hand. He was advised not to work for the next two weeks. (Tr. 153.)

On June 29, 1992, plaintiff reported "increasing discomfort" in his right knee and some left knee discomfort. An MRI was ordered for the right knee and plaintiff was given a note regarding job modifications. (Tr. 155.) Plaintiff then underwent arthroscopic surgery on his right knee.

On August 28, 1992, Dr. Aversa reported that plaintiff had "tolerated the [arthroscopic] surgery. He has an effusion and it is aspirated today." (Tr. 156.) Two weeks later, plaintiff was "partial weight bearing" and was referred to physiotherapy. (Tr. 157.)

On November 16, 1992, Dr. Aversa reported that plaintiff had been out of work for three months. He observed a good range of motion, including full extension, but noted plaintiff's strength had not returned and he had trouble going up and down stairs. Plaintiff was not on any medications, except aspirin, as needed. He was to continue with physical therapy and using a cane. (Tr. 159.) Dr. Aversa was to see plaintiff in a month to evaluate him for his return to work and to evaluate his left knee for arthroscopic surgery. (Tr. 159.)

In January, 1993, Dr. Aversa reported that plaintiff's strength had increased and he had good range of motion in his right knee. (Tr. 160.) He stated that plaintiff was "unable to work as a laborer at the present time. He could do light bench work or clerical type work." Plaintiff continued to use a cane. (Tr. 160.)

The following month, Dr. Aversa observed excellent range of motion in plaintiff's right knee and suggested that the physical therapist should wean plaintiff to a home program. Plaintiff also reported medial left knee pain, which had been present for a long time, and Dr. Aversa ordered an MRI. Dr. Aversa also suggested a weight reduction program to plaintiff. (Tr. 161.)

In June, plaintiff complained of pain over his right knee and radiographs showed some medial compartment narrowing. Dr. Aversa prescribed lateral sole and heel wedges and again reiterated the need for plaintiff to lose weight. (Tr. 162.)

In August, 1993, Dr. Aversa reported that plaintiff had been out of work for a year and suggested vocational rehabilitation. He noted that plaintiff's knee pain had improved with the heel wedges.

---

**4.** "Chondromalacia"—"softening of the articular cartilage, most frequently in the patel-la." *Dorland's Illustrated Medical Dictionary* at 310 (25th ed.1974).

Plaintiff could squat half-way down and could lean forward and touch his toes. Dr. Aversa recommended that plaintiff continue activity to tolerance, weight reduction, and an aspirin as needed for pain. (Tr. 164.)

In late November, knee radiographs showed medial compartment degenerative changes bilaterally. Dr. Aversa again discussed retraining because plaintiff could not return to the work he had been performing. Dr. Aversa noted that plaintiff had lost 17 pounds and weighed 257. (Tr. 165.)

### 2. Plaintiff's Continuing Knee Problems and Back and Neck Pain—1994

In March of 1994, Dr. Aversa's records reflect that plaintiff reported ongoing knee pain as well as low back pain, ankle pain and foot pain. Questioning whether these new symptoms were related to the wedges plaintiff had been wearing in his shoes, Dr. Aversa ordered an inflammatory work-up. (Tr. 166.) Dr. Aversa noted that plaintiff was losing weight, still using a cane, and not on any medications. (Tr. 166.) X-rays of the cervical spine suggested degenerative disc disease of plaintiff's neck and back. (Tr. 167.) X-rays of the knees suggested some "medial compartment arthritis bilaterally." Ankle x-rays were negative. (Tr. 166.) In April, 1994, Dr. Aversa prescribed Naprosyn for pain and advised plaintiff to continue using a cane and wedges in his shoes. (Tr. 167.)

In June, 1994, he referred plaintiff to Dr. Barbara Roach for a rheumatologic evaluation. (Tr. 168.) He described plaintiff as having generalized aches and pain of his neck, arms, hands, and feet but noted that plaintiff denied morning stiffness. He stated that the inflammatory work-up was negative. (Tr. 168.) He was not quite sure of the etiology of plaintiff's joint complaints and suggested that it might just be osteoarthritis. (Tr. 168.)

Dr. Aversa's notes of September 19, 1994, indicate that Dr. Roach had seen plaintiff and prescribed new medications.[5] (Tr. 170.) On December 19, 1994, Dr. Aversa stated that plaintiff is having right and left medial knee discomfort. He completed the form for physical capacities and gave plaintiff a 15% disability rating for the left leg and a 10% permanent disability rating for the right leg. (Tr. 171.)

### 3. Plaintiff's Multiple Joint Complaints—1996

On January 17, 1996, plaintiff first saw Dr. Sonia Gordon–Dole, a rheumatologist. Plaintiff gave a history of multiple joint aches that had persisted for at least five years and that he had been out of work on workers' compensation for the past two years. He related that he had bilateral shoulder pain since December 1993, which increased with lying down at night, reaching, and driving. He also complained of increased elbow pain upon lifting and hand and wrist pain. He described problems with dressing, writing, locking fingers, and decreased range of movement in his hands. He stated that his knees were a "mess" and that he could not go up stairs easily or get up from the floor. He related that his right ankle gave out on him occasionally and he was easily fatigued. (Tr. 177.) After a physical examination of plaintiff, Dr. Gordon–Dole's impression was the "possibility of a low grade inflammatory

---

5. We do not have Dr. Roach's medical records. Dr. Gordon–Dole's records indicate that it was Dr. Roach's opinion that there was "no evidence of an inflammatory arthritis or fibromyalgia, but early osteoarthritis was considered." (Tr. 177.) Dr. Aversa reported that Dr. Roach had prescribed anti-inflammatories and given plaintiff arch supports for his shoes. (Tr. 170.)

arthritis," and, therefore, she planned to repeat his serologies and ordered new X-rays. She also suggested a new course of physical therapy. (Tr. 177–179.) The laboratory tests were negative insofar as plaintiff's arthritic complaints were concerned. (Tr. 187.) He did not see Dr. Gordon–Dole again for over a year.

### 4. Plaintiff's Continued Treatment for Knee Problems—1996–1997

In March, 1996, plaintiff had an MRI of his right knee performed. Dr. Aversa noted that the MRI suggested osteochondritis dissecans of the lateral femoral condyle, although he noted that the x-rays did not show this. Plaintiff continued to use a cane and had limited activities. (Tr. 173.) A CT Scan was then obtained. On April 1, 1996, Dr. Aversa noted that the etiology of plaintiff's knee pain was not clear and that, if the pain continued, an arthroscopic evaluation would be considered. (Tr. 174.)

On July 15, 1996, in a letter to Attorney Louis Federici, Dr. Aversa wrote:

Mr. Gagnon is a custodian and his knee problems certainly limit him from doing all the tasks required of a custodian. Any activities that require squatting, crawling, climbing, prolonged standing and significant lifting and carrying would not be possible for him at this time. Unfortunately, I do not believe this will change in the future. This, along with other osteoarthritic complaints make him unemployable as a *laborer*.

(Tr. 176) (emphasis added). Dr. Aversa's office notes of that same date indicate his opinion that plaintiff should apply for social security. (Tr. 175.)

### 5. Plaintiff's Continuing Joint Pains—1997

In February 1997, plaintiff saw Dr. Gordon–Dole for the second time for his joint aches and persistent complaints of right shoulder pain, right elbow and right hand pain, which had gotten progressively worse. Plaintiff complained of soreness and stiffness, but no swelling. He reported difficulty with prolonged sitting, standing or lifting, and Dr. Gordon–Dole advised him to avoid those activities. Plaintiff was taking over-the-counter pain medication as needed. She urged him to have repeat X-rays to check for progression. She ordered a complete arthritis profile to ensure that there were no "new issues" and prescribed Flexeril. (Tr. 187–88.) She concluded, "In summary, the patient is significantly disabled and due to his complaints, does not appear to be employable at this time." (Tr. 188.)

X-rays taken thereafter showed no change from the previous year. (Tr. 193–94.)

### 6. Functional Capacity Assessments

A Functional Capacity Assessment performed by Dr. John Franco on April 4, 1997, and another by Dr. Khurshid Khan on July 28, 1997, showed that plaintiff could lift 20 pounds occasionally, 10 pounds frequently, that he could stand and/or walk for 6 hours out of an 8–hour day, that he could sit for the same period, and that his ability to push and/or pull was unlimited other than as shown above. He had occasional postural limitations (frequent for balancing), but no manipulative, visual, communicative, or environmental limitations. (Tr. 197–204, 209–16).

In July 1997, the Connecticut Disability Determination Services referred plaintiff to Dr. John O'Brien for evaluation. Dr. O'Brien noted that plaintiff reported generalized aches and pains up and down his spine. On an average day, he got up and basically sat around the house. Straight leg raising was negative; lumbar flexion was 50 degrees; neurological examination was negative; strength and sensation re-

flexes were normal; there was generalized weakness but no focal neurological deficit. (Tr. 208.)

### 7. Subsequent Treatment by Dr. Gordon–Dole

Also contained in the administrative record are two reports from Dr. Gordon–Dole from 1998 and 1999. These records are after December 31, 1997, the last day of plaintiff's insured status and the date on which his status as disabled must be determined. Therefore, these have only limited relevance.

In a Statement of Continued Disability to the Claims Department of an insurance company, Dr. Gordon–Dole reported that she had last seen plaintiff on September 2, 1998, and at that time she considered him totally disabled from his former work due to back and spine pain. She also opined that he was totally disabled from performing any other work but failed to list any limitations in this regard. (Tr. 247.)

Dr. Gordon–Dole next saw plaintiff on September 15, 1999. She noted that plaintiff had gained 27 pounds. Based on her examination, her impression was bilateral knee degenerative joint disease and degenerative disc disease of the spine. He had new paresthesias [6] of the left arm. (Tr. 241–42.) An MRI of plaintiff's cervical spine, performed on October 1, 1999, showed no evidence of cervical intervertebral disc bulge or herniation, very minimal degenerative disc disease and no evidence of subluxation [7] within the cervical spine. (Tr. 243.) The MRI of the lumbar spine, performed on October 4, 1999, showed a broad-based bulge of the disc material at L2–3 and moderate severe bilateral facet arthropathy at L4–5, L5–S1. (Tr. 244.) In a report to Prudential Insurance Com-

pany, Dr. Gordon–Dole reiterated that plaintiff was disabled from his job and any other work and listed his limitations as "No bending, lifting, stooping." (Tr. 240.)

### C. Plaintiff's Testimony

At the hearing before the ALJ, plaintiff testified that he is married with two children, ages 16 and 19. He and his family have lived with his mother since October, 1996. (Tr. 39.) He is unable to work as a studio photographer because he cannot carry the equipment or climb ladders on get in different positions, which is required for that work. (Tr. 38.) The length of time that he can sit depends on the chair. In some chairs he gets uncomfortable very quickly, in others it takes "a while." (Tr. 38.) He cannot stand for very long before his knees and back start hurting. (Tr. 38.) He cannot "lift that much anymore." (Tr. 38.) He can manage to lift about a gallon of milk but even that bothers him a lot of times. (Tr. 38.)

He is able to drive for short distances. (Tr. 39.) He spends his days watching television, listening to the radio and reading. He spends most of his time lying in a lounge chair, more than four hours a day. (Tr. 40–41, 45–46.) Sometimes he works on models, but he can only work on them for 30 minutes to an hour at a time. (Tr. 41.) He runs family errands, such as taking people to work and going to the bank for them. (Tr. 40–41.) He states that his hands are too stiff with arthritis to allow him to do many activities. (Tr. 41.) He has trouble opening jars, working with tools, and writing for more than 10 or 20 minutes. He is not able to use a computer because he cannot manipulate the key-

---

6. "Paresthesia"—an abnormal sensation, such as burning or prickling. *Dorland's Illustrated Medical Dictionary* at 1139 (25th ed.1974).

7. "Subluxation"—"an incomplete or partial dislocation." *Id.* at 1488.

board. (Tr. 42–43.) Plaintiff uses a cane. (Tr. 44.) He also has trouble walking because a "couple of times" his knees have buckled, and he has problems with his balance due to an inner ear problem. (Tr. 43–44.)

Plaintiff described the pain caused by his arthritis as in his knees, his low back, his neck, shoulders, elbows, hands, feet, and big toe. (Tr. 44.) His knees, lower back and upper neck are "real bad." (Tr. 45.) He does not have problems with his hips. (Tr. 44.) The intensity of the pain varies with the weather. (Tr. 44.) He described the pain as "constant nagging pain. Sometimes it's a sharp pain if I move the wrong way." (Tr. 44.) The pain in his neck limits his ability to turn his head, which sometimes affects his ability to drive. (Tr. 45.) Plaintiff takes Flexeril, a muscle relaxant, as needed for muscle spasms, as well as over-the-counter medications, such as Advil and Tylenol, for pain. Sometimes he just takes pain relief medication at night and other times, he takes it all day long. (Tr. 46.) Plaintiff testified that he went to physical therapy in 1994, where he learned exercises to do for his neck and back. (Tr. 48.) He also uses a heating pad to help loosen his neck muscles. In terms of frequency, he does not do this everyday. It depends on how stiff his neck gets. (Tr. 49.) He testified that he has difficulty sleeping because of the pain he experiences from his arthritis. (Tr. 46.)

### D. The Vocational Expert's Testimony

The Vocational Expert ("VE"), Ronald Freedman, a certified vocational rehabilitation specialist, testified that plaintiff's work as a library custodian was rated as heavy, unskilled labor. (Tr. 50.) His work as a grounds keeper was in the medium to heavy range, also unskilled. (Tr. 50.) In response to a hypothetical, in which he was asked to assume that the plaintiff was exertionally capable of performing work at the sedentary level, with the additional restrictions of minimum demands of fine manipulation, minimal requirements to reach and grasp and only gross manual dexterity, he was of the opinion that plaintiff could perform jobs such as a surveillance monitor. (Tr. 51.) He testified that there were approximately 200–250 such jobs locally and 30,000 nationally. (Tr. 51–52.) In response to a hypothetical by plaintiff's attorney, the Vocational Expert testified that, if an individual had to recline for more than 4 hours in an eight-hour day, he could only perform the surveillance monitoring job on a part-time basis, which would reduce the number of available jobs to less than a significant number. (Tr. 53–54.)

### III. Discussion

#### A. Standard of Review

We review the Commissioner's decision to determine whether it is supported by substantial evidence. 42 U.S.C. § 405(g); *Diaz v. Shalala*, 59 F.3d 307, 314 (2d Cir.1995). "Substantial evidence" is less than a preponderance, but more than a mere scintilla. It has been quantified as such evidence as a "reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir.2000); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Under this standard, absent an error of law, this Court will uphold the Commissioner's decision if it is supported by substantial evidence even if this Court might have ruled differently were we to have made the initial decision. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir.1982), *cert. denied*, 459 U.S. 1212, 103 S.Ct. 1207, 75 L.Ed.2d

447 (1983); *see generally* Hon. Thomas P. Smith & Patrick M. Fahey, *Some Points on Litigating Title II and Title XVI Social Security Disability Claims in United States District Court,* 14 Quinnipiac L.Rev. 243, 249 (Summer 1994).

### B. *"Disability" under the Social Security Act*

In order to establish an entitlement to disability benefits under the Social Security Act, plaintiff must prove that he is "disabled" within the meaning of the Act. A plaintiff may be considered disabled only if he cannot perform any substantial gainful work because of a medical or mental condition which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must be of such severity that the claimant is not only unable to do his previous work, but, additionally, considering his age, education, and work experience, he cannot engage in any other kind of substantial gainful employment, which exists in the national economy, regardless of whether such work exists in the immediate area where he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. 42 U.S.C. § 423(d)(2)(A). "Work which exists in the national economy" means work which exists in significant numbers either in the region where he lives or in several regions in the country. *Id.*

The Social Security Regulations set forth a sequential five-step process for evaluating disability claims. *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. 20 C.F.R. § 404.1520(b). If the claimant is currently employed, the claim is disallowed. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is denied. 20 C.F.R. § 404.1520(c). Once the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations (the "listings"). 20 C.F.R. § 404.1520(d); *Bowen v. Yuckert,* 482 U.S. 137, 141, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). If the claimant's impairment meets or equals one of the impairments in the listings, the claimant is automatically considered disabled. 20 C.F.R. § 404.1520(d); *see Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982). If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his past relevant work. 20 C.F.R. § 404.1520(e). If the claimant cannot perform his former work, the burden then shifts to the Commissioner to show that the claimant is prevented from doing any other work. A claimant is entitled to receive disability benefits only if he cannot perform any alternate gainful employment. 20 C.F.R. § 404.1520(f).

The initial burden of establishing disability is on the claimant. *See* 42 U.S.C. § 423(d)(5). Once the claimant demonstrates that he is incapable of performing his past work, however, the burden shifts to the Commissioner to show that the claimant has the residual functional capacity ("RFC") [8] to perform other

---

**8.** "Residual functional capacity" refers to what a claimant can still do in a work setting despite his physical and mental limitations caused by his impairments, including related symptoms such as pain. In assessing an individual's RFC, the ALJ is to consider his symptoms (such as pain), signs and laboratory findings together with the other evidence. *See* 20 C.F.R. § 404.1545.

substantial gainful activity in the national economy.[9] *See Curry v. Apfel,* 209 F.3d 117, 123 (2d Cir.2000); *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986); *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980).

### C. The Alleged Errors in the Instant Case

In the instant case, the first four steps are not at issue. The ALJ found that plaintiff had met his burden of proving that his impairments prevented him from performing his past work. Because substantial evidence in the record exists to support that conclusion and the Commissioner does not appeal it, we turn to the fifth step, *i.e.,* whether the Commissioner carried his burden of proving that plaintiff could perform other work existing in significant numbers in the national economy.

In his appeal, plaintiff argues that he has been unable to perform substantial gainful employment since at least December 31, 1995, because of multiple joint pain in his neck, shoulders, elbows, and hands, as well as bilateral knee degenerative joint disease and degenerative disc disease of his spine. He claims that these impairments not only prevent him from working at his prior job but that he is left with a residual functional capacity for less then sedentary work. He argues that there is substantial evidence in the record that establishes that he is unable to perform substantial gainful activity and there is no substantial evidence to support any other decision. (Pl.'s Mem. at 15.)

Specifically, he challenges the ALJ's decision on three grounds:

(1) the ALJ failed to follow the treating physician rule and ignored his treating physicians' opinions;

(2) the ALJ failed to consider correctly plaintiff's testimony and made an erroneous credibility finding; and

(3) the ALJ erroneously applied the regulations in assessing plaintiff's RFC and improperly chose to become his own vocational expert in assessing plaintiff's RFC.

### 1. The Treating Physician Rule

■ The regulations promulgated by the Social Security Administration provide that a treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). However, "[a] statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [the claimant is] disabled." 20 C.F.R. § 404.1527(e); *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000). The Regulations specifically provide that the determination of whether a claimant is disabled is a determination to be made by the Commissioner, 20 C.F.R. § 404.1527(e). Therefore, the Commissioner is not bound by a doctor's opinion regarding disability.

---

**9.** This may require the application of the Medical–Vocational Guidelines ("the grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, which places claimants with severe exertional impairments who can no longer perform past relevant work into grid categories according to their RFC, age, education, and work experience, and dictates a conclusion of disabled or not disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2. A proper application of the grid makes vocational testing unnecessary. The grid, however, covers only exertional impairments; nonexertional impairments are not covered. As a general rule, if the grid cannot be used, *i.e.* when significant nonexertional impairments are present or when exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *Bapp v. Bowen,* 802 F.2d 601, 605 (2d Cir.1986).

*See Parker v. Callahan,* 31 F.Supp.2d 74, 77 (D.Conn.1998). Likewise, the Commissioner will not give enhanced weight to a treating physician's opinion as to the claimant's RFC. 20 C.F.R. § 404.1527(e); SSR 96–5p.

Plaintiff complains that the ALJ did not adopt the opinions of Dr. Gordon–Dole and Dr. Aversa that he had less than an RFC for sedentary work.[10] Plaintiff points to the statement of Dr. Aversa in 1996 that he was not "weight bearing." (Tr. 173.) Dr. Aversa, however, did not state that plaintiff was not weight bearing. In the record cited by plaintiff, dated March 6, 1996, Dr. Aversa stated that plaintiff "will continue *partial* weight bearing." (Tr. 173.) On plaintiff's next visit in July, 1996, Dr. Aversa reports that plaintiff's knee problems prevent him from doing his past work as a custodian and that he is unemployable as a *"laborer."* (Tr. 176.) Dr. Aversa never expressed an opinion that plaintiff could not perform sedentary work.

Plaintiff also points to the 1997 report of Dr. Gordon–Dole in which she opined that plaintiff should avoid prolonged sitting, standing, and lifting (Tr. 173), and that he was disabled from his past work and all other work. *See* Attending Physician's Statement of Continued Disability (Tr. 247).[11]

The ALJ's Decision, however, reflects that he considered Dr. Gordon–Dole's opinion, but rejected it as not supported by her examination findings. In February, 1997, after plaintiff's second visit to Dr. Gordon–Dole, she wrote,

> In summary, the patient is significantly disabled and *due to his complaints,* does not appear to be employable at this time.

(Tr. 188)(emphasis added). In that same report, however, she stated, *inter alia,* that examination of plaintiff's neck showed only a *"mild* decrease in extension," *"good flexion,"* and "pain at the *extremes* of movement." (Tr. 187)(emphasis added). Additionally, she reported that his hips showed a "good range of motion." (Tr. 187.) Also, plaintiff's x-rays showed only mild degenerative changes and no evidence of inflammatory arthritis. His only medications were Tylenol, Advil, and Bufferin, as needed. Subsequent X-rays showed no change from a year before. (Tr. 193.)

In 1998, Dr. Gordon–Dole completed the Attending Physician's Statement of Continued Disability (*see* Note 12, *supra*) and, although she did indicate that plaintiff was totally disabled from his previous job and any other work, she failed to list any limitations that would prevent plaintiff from

---

**10.** The Regulations provide:
 Sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
 20 C.F.R. § 404.1567(a).

**11.** The Attending Physician's Statement of Continued Disability signed by Dr. Gordon–Dole is not dated but indicates that she last

saw plaintiff on September 2, 1998 (which is after the date on which plaintiff's insured status expired), and that the frequency of his visits was "yearly." The only treatment noted was Flexeril, as needed. As for his "prognosis," she responded to the question, "Is patient now totally disabled?" by checking the box "yes" as to "Patient's Job" and "yes" as to "Any other work." She indicated that plaintiff's condition had stabilized. In response to the question "What limitations prevent this patient from returning to his or her previous occupation?" she responded, "Joint pain, spine pain." She did not respond to the same question with respect to "any gainful employment." (Tr. 247.)

performing any other work. (Tr. 247.) In 1999, following plaintiff's September 15, 1999, appointment, she checked the same boxes on the Attending Physician's Statement of Continued Disability (Tr. 240), but the only limitations noted were "No bending, lifting, stooping." These limitations, which were noted by the ALJ, do not limit the plaintiff to less than sedentary work.

The ALJ further found that her opinion was not supported by plaintiff's other treating physician, Dr. Aversa, who had only found plaintiff limited as to the work of a laborer/custodian. (Tr. 176.) The ALJ also cited the consultative examination of Dr. O'Brien, who reported on plaintiff's degrees of flexion, the fact that plaintiff was able to walk with a cane and had a normal neurological examination for strength sensation reflexes. (Tr. 208.)

Moreover, the functional capacity assessments performed by Drs. Franco and Khan showed that plaintiff had the capacity to occasionally lift up to 20 pounds, frequently lift 10 pounds, that he could stand and/or walk with normal breaks for a period of 6 hours in an eight-hour day, that he could sit for the same length of time, and had unlimited ability to push and/or pull other than as noted above. This is in direct contrast to Dr. Gordon–Dole's opinion that he was totally disabled.

█ As recognized by the regulations, because the ultimate determination of whether a claimant is disabled is to be made by the Commissioner, a treating physician's statement that the claimant is disabled cannot itself be determinative. 20 C.F.R. § 404.1527(e)(1); *see Jordan v. Barnhart*, 29 Fed.Appx. 790, 793–94, 2002 WL 448643, at *3 (2d Cir.2002)(unpublished decision); *see also Bond v. Social Security Administration*, 20 Fed.Appx. 20, 21, 2001 WL 1168333, at *2 (2d Cir.2001)(unpublished decision). Additionally, there was substantial evidence contra-

dicting Dr. Gordon–Dole's opinion of disability, both in terms of objective medical findings as well as the opinions of other doctors. Therefore, we find no error in the ALJ's not giving controlling weight to her opinion regarding plaintiff's disability.

### 2. *Plaintiff's Credibility*

Plaintiff further argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to give specific reasons for rejecting plaintiff's testimony as lacking credibility.

The ALJ, after reviewing plaintiff's testimony concerning the limitations he experienced because of his arthritis, examined the objective medical evidence and concluded that it did "not support a finding of such severity as to preclude all work as alleged" by plaintiff. (Tr. 20.) He then discussed Dr. Gordon–Dole's findings upon examination of the plaintiff and the consultative examination by Dr. O'Brien, discussed above, and concluded "the claimant's statements concerning his impairment and its impact on his ability to work are not entirely credible in light of discrepancies between the claimant's assertions and information contained in the documentary reports as described above." (Tr. 20.)

█ It is within the ALJ's discretion to evaluate a claimant's credibility and arrive at an independent judgment in light of the medical findings and other evidence regarding the true extent of the limitations experienced by plaintiff. *See Jordan v. Barnhart*, 29 Fed.Appx. 790, 794, 2002 WL 448643, at *4 (2d Cir.2002). Because the ALJ determined that the objective medical evidence did not fully support plaintiff's subjective complaints, the ALJ was required to consider other factors in evaluating those complaints, such as plaintiff's daily activities, medications taken for relief

of pain and other symptoms, and other treatment or measures taken to relieve the pain and other symptoms. 20 C.F.R. § 404.1529(c)(3); *see Tappan v. Halter*, 10 Fed.Appx. 30, 32, 2001 WL 604767, at *2 (2d Cir.2001). This he did.

 In terms of the objective evidence, X-rays of the cervical and lumbosacral spine in 1996 showed only mild degenerative spondylosis. There was no radiographic evidence of inflammatory arthritis. (Tr. 185.) X-rays the following year showed no progression. (Tr. 193–94.) In terms of his day-to-day activities, plaintiff testified that he runs errands for the family, including taking them to work several days a week; he walks the dog in the back yard; he works on models, sometimes for up to an hour at a time. Although plaintiff also testified that he is unable to work due to his arthritis and its resultant pain, the medical records indicate that plaintiff takes very little pain medication, only over-the-counter medicine such as Advil, Bufferin, and Tylenol. *See Tappan v. Halter*, 10 Fed.Appx. at 32, 2001 WL 604767, at *2 (noting that the ALJ properly took into account that the plaintiff took no prescription medication for pain). Additionally, since 1997, plaintiff has treated with his rheumatologist, Dr. Gordon–Dole, only on an annual basis. And, although Dr. Gordon–Dole opined that plaintiff was disabled from all work, the only limitations she mentioned were ones actually credited by the ALJ. Moreover, the RFC assessments specifically contradicted plaintiff's testimony.

Thus, we find no error in the ALJ's credibility determination with respect to plaintiff's testimony regarding his subjective complaints.[12]

### 3. The ALJ's Determination of RFC

Plaintiff also complains that the ALJ erred in failing to give any basis for his RFC determination, in failing to consider the factors as required by SSR 96–8p[13] and 95–5p[14], in failing to consider plaintiff's non-exertional limitations, and in substituting his own opinion for that of the Vocational Expert.

Contrary to plaintiff's assertion, the ALJ's Decision reflects that he considered plaintiff's subjective complaints, to the extent that he found them to be credible, and he also reviewed the medical evidence, including the records of Dr. Aversa, Dr. Gordon–Dole, and Dr. O'Brien. Based on these factors, he made a determination of plaintiff's RFC to perform the *exertional* demands of light work, but then went on to consider plaintiff's *non-exertional* limitations, which he found diminished plaintiff's capacity to perform light work. (Tr. 21.) Thus, the ALJ clearly considered and gave credence to plaintiff's non-exertional limitations.

Having found that plaintiff's impairments did not meet the requirements of

**12.** It is also significant to note that the ALJ did not discredit his testimony entirely. He found that plaintiff had the residual functional capacity to perform the exertional demands of light work. (Tr. 21.) Nevertheless, due to non-exertional limitations of which plaintiff complained, including limitations that make it difficult for plaintiff to climb stairs, stoop, kneel, crouch, crawl and to maintain his balance, the ALJ found his capacity for light work to be diminished. (Tr. 21.)

**13.** SSR 96–8p states:

Ordinarily, an RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, and an equivalent work schedule.

**14.** SSR 95–5p concerns assessing the claimant's credibility and subjective complaints of pain and other symptoms in the disability determination process.

the "listings" and that he was unable to perform his past work, the ALJ then turned to the question of whether the Commissioner had carried her burden of showing that plaintiff had the ability to do other work.

Plaintiff argues that the ALJ erroneously denied plaintiff's claim using Medical–Vocational Rule 202.20 as a "framework." (Pl.'s Mem. at 20.) Contrary to plaintiff's assertion, in accordance with the regulations, the ALJ found that "[s]trict application of these rules [Rule 202.20] is *not* possible, however, as the claimant had non-exertional limitations which narrowed the range of work he was capable of performing...." (Tr. 21)(emphasis added). (Tr. 21, 22); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 200.00(e)(2),[15] 202.00, & Table No. 2. Thus, the ALJ recognized that he could not base his decision on Rule 202.20. Instead, the ALJ considered plaintiff's exertional and non-exertional limitations, as well as his age, education, and work experience, and found that plaintiff was able to perform other work existing in significant numbers in the national economy.

Although the ALJ did not specifically reference the testimony of the Vocational Expert in this portion of his Decision (although it is referenced elsewhere), it is clear to the Court that the ALJ relied upon that opinion in making his determination for his conclusion is precisely the same as the opinion expressed by the Vocational Expert at the hearing.[16] (Tr. 50–51.) The Vocational Expert testified, and the ALJ found, that based on plaintiff's age, education, and work experience, he could perform nationally available jobs consistent with his exertional and non-exertional limitations.

■ Thus, there is no basis for assuming that the ALJ was substituting his own personal opinion for that of the Vocational Expert nor ignoring the medical evidence in the record nor improperly basing his decision on the Medical–Vocational Guidelines.

### IV. Conclusion

Having carefully reviewed the record as a whole and having rejected plaintiff's challenges to the Commissioner's final decision denying plaintiff's application for disability benefits, the Court **GRANTS** the Motion of the Commissioner for an Order Affirming the Decision of the Commissioner [**Doc. # 12**] and **DENIES** the Motion of

15. The Medical–Vocational Guidelines, § 200.00(e)(2), provide in relevant part that where an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations, the rules in this subpart are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone and, if not, the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the non-exertional limitations. Also, in these combinations of nonexertional and exertional limitations which cannot be wholly determined under the rules in this appendix 2, full consideration must be given to all of the relevant facts in the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations, which will provide insight into the adjudicative weight to be accorded each factor.

16. Indeed at the hearing, the ALJ asked the Vocational Expert to assume that plaintiff was only able to perform work at the *sedentary* level, which is significantly more restrictive than work at the light level of exertion, and with the additional restrictions of minimum demands of fine manipulation, a minimal requirement to reach and grasp, and only gross manual dexterity. (Tr. 50–51.)

Plaintiff for an Order Reversing the Decision of the Commissioner [**Doc. # 9**].

SO ORDERED.