**Sandra L. HORBOCK, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner, Social Security Administration, Defendant.**

**No. 3:01CV1404(GLG).**

United States District Court, D. Connecticut.

July 11, 2002.

Robert S. Reger, Rolnick & Reger, Hamden, CT, for Plaintiff.

Ann M. Nevins, U.S. Attorney's Office, Bridgeport, CT, for Defendant.

### *OPINION*

GOETTEL, District Judge.

Plaintiff has brought this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security denying her application for a period of disability and disability insurance benefits ("DIB") under § 216 and § 223 of the Social Security Act, 42 U.S.C. §§ 416, 423. Plaintiff has moved for an order reversing the decision of the Commissioner or, in the alternative, remanding the case for rehearing [**Doc. # 8**], and defendant has moved for an order affirming the decision of the Commissioner [**Doc. # 10**]. For the reasons set forth below, we grant the plaintiff's motion.

### *DISCUSSION*

**I. Procedural History**

On June 13, 1999, plaintiff filed an application for DIB claiming that she had been

unable to work since June 9, 1998, due to carpal tunnel syndrome, arthritis, and drug and alcohol abuse. (Tr. 93–95, 103–112).[1] Her application was denied initially (Tr. 53–58), and plaintiff sought reconsideration. (Tr. 66). On reconsideration, the initial denial was sustained. (Tr. 67–70). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 71–72). A hearing was held on October 30, 2000, at which plaintiff, represented by counsel, testified, as did a vocational expert. (Tr. 27–52). The ALJ, in a decision dated February 9, 2001, concluded that, although plaintiff could not perform her former employment, there were a significant number of sedentary jobs[2] in the national economy that she could perform, thus, dictating a finding of "not disabled." (Tr. 13–21). Plaintiff then requested that the Appeals Council review the ALJ's decision (Tr. 7–9), which it declined to do (Tr. 5–6), making the ALJ's decision the final agency determination and, thus, subject to judicial review.

We review the Commissioner's decision to determine whether it is supported by substantial evidence. 42 U.S.C. § 405(g); *Diaz v. Shalala,* 59 F.3d 307, 314 (2d Cir. 1995).

The sole argument raised by plaintiff in this appeal is that the ALJ ignored the vocational expert's testimony that, in light of the limitations imposed by plaintiff's treating orthopedic surgeon, there are no jobs in the national economy that Plaintiff can perform, and, accordingly, she is disabled. (Pl.'s Mem. at 8).

## II. "Disability" Under the Social Security Act

In order to establish an entitlement to disability benefits under the Social Security Act, plaintiff must prove that she is "disabled" within the meaning of the Act. A plaintiff may be considered disabled only if she cannot perform any substantial gainful work because of a medical or mental condition which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must be of such severity that the claimant is not only unable to do her previous work, but, additionally, considering her age, education, and work experience, she cannot engage in any other kind of substantial gainful employment, which exists in the national economy, regardless of whether such work exists in the immediate area where she lives, or whether a specific job vacancy exists for her, or whether she would be hired if she applied for work. 42 U.S.C. § 423(d)(2)(A). "Work which exists in the national economy" means work

1. "Tr." refers to the pages in the administrative record filed by the Commissioner in this case.

2. "The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 'Occasionally' means occurring from very little up to one-third of the

time, and would generally total no more than about 2 hours of an 8–hour workday. Sitting would generally total about 6 hours of an 8–hour workday. Unskilled sedentary work also involves other activities, classified as 'nonexertional,' such as capacities for seeing, *manipulation,* and understanding, remembering, and carrying out simple instructions." *Policy Interpretation Ruling Titles II and XVI: Determining Capability To Do Other Work— Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work,* SSR 96–9P, 1996 WL 374185, at *3 (S.S.A. July 2, 1996) (citing 20 C.F.R. § 404.1567(a)) (emphasis added).

which exists in significant numbers either in the region where she lives or in several regions in the country. *Id.*

The Social Security Regulations set forth a sequential five-step process for evaluating disability claims. *See* 20 C.F.R. § 404.1520. Neither side challenges the ALJ's findings with respect to the first four steps of this process. Rather, this appeal focuses solely on the fifth step, in which the Commissioner has the burden of proving that there are other jobs existing in significant numbers in the national economy that the claimant can perform, consistent with her residual functional capacity ("RFC"),[3] age, education and work experience.[4] 20 C.F.R. § 404.1520(f); *see Curry v. Apfel,* 209 F.3d 117, 123 (2d Cir.2000); *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986); *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980).

### III. Facts

Plaintiff was born on January 12, 1954. She attained a General Equivalency Degree (GED) in 1975 and attended the Stone School of Business in New Haven, Connecticut, where she received secretarial training. (Tr. 31–32). From 1982 to 1998, she worked as a secretary and receptionist for AT & T Communications. During her last two years at AT & T, she worked strictly as a receptionist. (Tr. 32–33). Since the date of the alleged onset of her disability, June 9, 1998, plaintiff has worked for only a two-week period in 1999 as a waitress. (Tr. 32). Otherwise, she has not engaged in any gainful employment since June 1998.

Plaintiff alleges that she became disabled on June 9, 1998, due to disorders of her back, carpal tunnel syndrome, drug and alcohol abuse, and depression. She states that she cannot work because of pain in her back and her hands. (Tr. 33). She has suffered from carpal tunnel syndrome since 1991, for which she has had surgery on both hands and later surgery on her right thumb, although she claims that her operations only caused her condition to worsen. (Tr. 35, 42). She states that she has widespread osteoarthritis and that she has also been diagnosed with rheumatoid arthritis.[5] (Tr. 35). Further,

---

**3.** "Residual functional capacity" refers to what a claimant can still do in a work setting despite her functional limitations and restrictions caused by her medically determinable physical or mental impairments. RFC is assessed by adjudicators at each level of the administrative review process based on all of the relevant evidence in the case record, including information about the individual's symptoms and any "medical source statements"—*i.e.,* opinions about what that individual can still do despite her severe impairment or impairments—submitted by that individual's treating sources or other acceptable sources. SSR 96–9P, 1996 WL 374185, at *1; *see* 20 C.F.R. § 404.1545.

**4.** This may require the application of the Medical–Vocational Guidelines ("the grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, which places claimants with severe exertional impairments who can no longer perform past relevant work into grid categories according to their RFC, age, education, and work experience, and dictates a conclusion of disabled or not disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2. A proper application of the grid makes vocational testing unnecessary. The grid, however, covers only exertional impairments; nonexertional impairments are not covered. As a general rule, if the grid cannot be used, *i.e.* when significant nonexertional impairments are present or when exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *Bapp v. Bowen,* 802 F.2d 601, 605 (2d Cir.1986).

**5.** As plaintiff's counsel admits in his brief,

> There is little in the medical record to document rheumatoid arthritis. Plaintiff testified that she was told by Dr. Mary Swaykus, at the Community Health Care Center in Meriden, that she had rheumatoid arthritis. A lab report, on which Dr. Swaykus ap-

she testified that she suffers from depression, which causes her to feel exhausted all of the time. (Tr. 36). In December 1999, plaintiff was involved in a head-on car accident, and, since then, she has experienced migraine headaches two to three times a week, which on two occasions have been so severe that she has gone to the Emergency Room. (Tr. 34, 41).

Plaintiff also has a long history of drug and alcohol abuse for which she has received in-patient, rehabilitative treatment on several occasions. Plaintiff testified that she has been "pretty much" "clean and sober" for the 17 years that she worked with AT & T but she began using drugs again after she became addicted to prescribed medications. (Tr. 40). She has been on daily Methadone treatments for two years. (Tr. 37, 43). She also takes Hydrocodone for her pain, Paxil and Trazadone for depression, and Irmitrex for migraines. (Tr. 36, 148).

In terms of her daily activities, plaintiff testified that she reads a little and watches television, but mostly just rests. (Tr. 48). She does not go out because she does not like being around crowds. (Tr. 38). She shops about once a week for groceries and once every two or three weeks for clothes. (Tr. 137). She attends NA (Narcotics Anonymous) meetings once a week. (Tr. 138). She cries a lot and she is exhausted all the time. (Tr. 40). She suffers from depression and anxiety attacks. (Tr. 40). She cannot twist a doorknob without using two hands and can only write for about five minutes because of the pain in her hands. (Tr. 44). She no longer pursues any hobbies, such as bowling and gardening, which she did in the past but is unable to do anymore. (Tr. 47).

pears as the referring physician indicates Ms. Horbock to have tested "positive" for rheumatoid factor screen.

## IV. The Vocational Expert's Testimony Before the ALJ

Dr. Jeff R. Blank, the vocational expert, testified that plaintiff is unable to perform her past relevant work as a secretary, which in her case involved lifting up to 50 pounds. (Tr. 49). In response to a hypothetical question posed by the ALJ, which described a claimant of plaintiff's age, education, and past relevant work experience, who could not maintain a competitive pace due to pain she experienced during an average eight-hour workday, Dr. Blank stated that there would not be any other jobs that she could perform. "[T]he decreased pace would interfere with any other work." (Tr. 49). In response to a second hypothetical in which he was asked to assume an individual of the plaintiff's age, education, and past relevant work experiences, who was limited to performing sedentary work and had the further restrictions of needing a supervised and low stress environment, defined as requiring few decisions, and who should avoid hazards, such as heights, vibrations, and dangerous machinery, Dr. Blank testified that there would be other unskilled, sedentary positions for such an individual, such as small parts assembly, visual inspecting, and testing, of which there were a substantial number in the national economy. (Tr. 50).

On cross-examination by plaintiff's counsel, Dr. Blank testified that, if the claimant in the second hypothetical also could not do keypunching for more than two hours a day because of fine motor limitations, that would preclude her from performing any of the jobs mentioned above. (Tr. 51).

## V. The Medical Evidence

The medical evidence submitted in support of plaintiff's application for disability

(Pl.'s Mem. at 3, n. 5).

benefits indicates that plaintiff, who is right-handed, suffers from bilateral carpal tunnel syndrome,[6] for which she has had a surgical release performed on both hands in 1991, followed by corticosteroid injections. She also had surgery on her right thumb in 1995. She has degenerative joint disease in her right thumb, plantar fasciitis in both feet, and back pain related to spondylosis of C4–6, L4–5, and L5–S1. She also suffers from depression and anxiety, and has a long history of drug and alcohol dependence, in partial remission, for which she was hospitalized on two occasions in 1998. She is now in a methadone treatment program. In December, 1999, she was in an automobile accident, which caused lumbar and cervical strains, exacerbation of her carpal tunnel syndrome, and migraine headaches.

Plaintiff asserts that the ALJ's finding of "not disabled," which was based on the second hypothetical question posed to the vocational expert, ignored the vocational expert's testimony on cross-examination that "given Dr. Kolstad's restrictions, there are no jobs available that plaintiff can perform!" (Pl.'s Mem. at 8). Thus, we focus on the restrictions contained in Dr. Kolstad's records.

Dr. Leonard A. Kolstad was plaintiff's treating orthopedic surgeon from February, 12, 1991, to October 20, 1997. He treated her primarily for carpal tunnel syndrome and related complaints involving her hands and wrists. He first saw plaintiff on February 12, 1991, for pain in both hands. In a letter to her referring physician, Dr. Kolstad wrote:

> As you know, she works as a keypunch operator for AT & T for the last 9 years. She keypunches on a regular basis from 4 to 8 hours daily. She indicates that many times during the day, she requires motion of her fingers and shaking the hand to rid herself of the numbness.... The right hand is more severely affected than the left.... She has had no significant shoulder or neck injuries.... She indicates that on the right side, there is pain ascending from the area of the palm, into the lower arm and then the shoulder with many activities....
>
> On clinical evaluation, I find [that] Adson's maneuver produces some numbness in her hand.... The two point discrimination is intact to all fingers but Phelan's [sic] test[7] is quickly positive into the thumb, index and long finger within several seconds.... There is no Tinel sign.[8] There is some discomfort in

---

6. Carpal tunnel syndrome is the compression of the median nerve as it passes through the carpal tunnel in the wrist. Activities or jobs that require repetitive flexion and extension of the wrist, such as keyboard use, may pose an occupational risk. Symptoms include pain of the hand and wrist associated with tingling and numbness, classically distributed along the median nerve (the palmar side of the thumb, the index and middle fingers, and the radial half of the ring finger) but possibly involving the entire hand. Typically the patient wakes at night with burning or aching pain and with numbness and tingling and shakes the hand to obtain relief and restore sensation. Diagnosis is indicated by a positive Tinel's sign, in which the tingling (parasthesia) is reproduced by tapping with a reflex hammer over the site of the median nerve and carpal tunnel. Additional tests include wrist flexion maneuvers (*e.g.*, Phalen's sign). Treatment includes a lightweight wrist splint, especially at night, vitamin $B_6$, mild analgesics, corticosteroid injections into the carpal tunnel, and if symptoms persist, surgical decompression of the carpal tunnel may be recommended. *The Merck Manual* 491–92 (17th ed.1999).

7. Phalen's test is a maneuver for detecting carpal tunnel syndrome which involves holding the affected hand with the wrist fully extended for 30 to 60 seconds. *Dorland's Medical Dictionary* 984 (28th ed.1994).

8. Tinel's sign is a sensation of "pins and needles" felt in the distal extremity of a limb when percussion in made over the injured

the thumb which causes breakthrough weakness but no thenar wasting.

I concur in your diagnosis of carpal tunnel syndrome . . . .

(Tr. 173).

Dr. Kolstad saw plaintiff again on February 28, 1991, at which time she complained of increasing discomfort in the hand. (Tr. 174).

On April 15, 1991, Dr. Kolstad wrote plaintiff's referring physician that plaintiff was having

> increasing numbness and discomfort with all activities. She was taken off keypunching and writes and does repetitive tasks around the office which cause an ongoing problem with numbness in the hands. She feels as though the numbness is constant into the thumb, index and long finger, partially into the ring finger on the right side. The left side is less severely involve [sic] . . . . Phelan's [sic] test is immediately positive into the thumb, index and long finger. The two point discrimination is decreased into the thumb, index and long finger on both sides with the right side being more severely affected. . . . She has abductor pollicis brevis weakness.

(Tr. 175). Dr. Kolstad suggested that plaintiff undergo surgery to release the carpal tunnel on the right side, and his notes indicate that plaintiff wished to proceed with this operation the following week. *Id.*

Although we do not have Dr. Kolstad's operative notes, his notes of April 25, 1991, indicate that plaintiff was "distinctly improved from her preoperative status." (Tr. 176). On May 7, two weeks after her

surgery, he noted her continued improvement, although she still had decreased two-point discrimination into the thumb. (Tr. 177). On May 23, his notes state that plaintiff no longer had any numbness in her fingers on the right hand but that she continued to have numbness in her left hand and wanted to have a release performed on that side. He reported that "[s]he is presently unable to return to work." *Id.*

On June 12, 1991, Dr. Kolstad performed a release of the left carpal tunnel and median nerve neurolysis. (Tr. 152). On June 17, 1991, Dr. Kolstad saw plaintiff five days after her second surgery and described her as "distinctly improved." *Id.* In August, 1991, he reported that plaintiff had returned to work full time. (Tr. 181).

On October 15, 1991, Dr. Kolstad reported that plaintiff was complaining that both hands and wrists hurt and that her hands were going numb. (Tr. 182). "She is typing all day and this increases the numbness and pain." *Id.* His examination revealed decreased two-point discrimination throughout, decreased pin prick to the palm, breakthrough weakness of the abductor pollicis brevises bilaterally. Her pain and numbness were exacerbated by the Phalen's test. *Id.* His opinion was that this represented a tenosynovitis [9] in addition to recurrent carpal tunnel syndrome. He injected the long flexor to the thumb, which provided some relief, and referred her for EMG and nerve conduction studies. He reported that *"[s]he is presently unable to work in any capacity that requires anything more than light typing. It may well eventuate that the patient is not able to return to any job that requires*

---

nerves, indicating a partial lesion. *Dorland's Medical Dictionary* 1421 (25th ed. 1974).

9. Tenosynovitis is an inflammation of the tendon sheaths of the hand. *The Merck Manual* 496 (17th ed. 1999).

any significant typing or keypunching." *Id.* (emphasis added).

On October 29, 1991, Dr. Kolstad reported that plaintiff's hands had improved and that she could return to work the following week in a "light duty capacity, i.e., *not to involve more than 2 hours of typing or keypunching per day.*" *Id.* (emphasis added). Two weeks later, plaintiff returned to see Dr. Kolstad and reported that she had been sent home from work with instructions not to return to work until she could type eight hours daily. Both hands were still painful and she reported tingling at night. The right hand was worse in the thumb. Plaintiff advised Dr. Kolstad that she believed she could work about "one-half time capacity," which he considered reasonable. (Tr. 183). He ordered physical therapy and opined that the "patient may not be able to return to her former job because of these symptoms." *Id.*

On December 10, 1991, plaintiff reported to Dr. Kolstad that she had been attending physical therapy and that her hands felt improved but that she was still experiencing discomfort in both hands. She had been working on a half-day basis but had not been doing any typing. Dr. Kolstad discussed with her various treatment options, including corticosteroid injections into the tendon sheaths, anti-inflammatory medications, and additional surgery. He referred her for thyroid function tests and for a second opinion. He stated that he believed she could attempt to return to her previous job full time and indicated *"it is possible that she may not be able to accomplish any job that involves prolonged typing."* (Tr. 184)(emphasis added). Two weeks later, following his examination of plaintiff, Dr. Kolstad wrote that "at the present time, *she is employable in a posi-*tion *that will not involve more than two hours of typing.*" (Tr. 185)(emphasis added). She was to return in four weeks.

On January 30, 1992, plaintiff returned to see Dr. Kolstad. She reported overall improvement in her hands with only occasional hypesthesia[10] into the fingers and the greatest discomfort with her right thumb. His examination of her hands revealed tenderness over the proximal pulley, and tenderness to a lesser degree over all pulleys of both hands. Dr. Kolstad was of the opinion that this represented a flexor tenosynvitis that previously gave her carpal tunnel symptoms and numbness into the fingers. He stated that he "believe[d] that *she will not be able to return to any job which involves keypunching, typing or repetitive motion of the fingers for more than about 2 hours in an 8 hour period.*" *Id.* (emphasis added).

Three months later, plaintiff returned to see Dr. Kolstad and reported that her condition had worsened, despite the fact that she had not been working. She was experiencing constant numbness and increased pain in her right thumb. Dr. Kolstad found tenderness to palpitation of the proximal pulley and injected the tendon sheath with Xylocaine and Celestone, which provided relief from the pain. On examination, she had no feeling to pin prick in the thumb. He sent plaintiff for an EMG and nerve conduction studies. He was of the opinion that she could return to work on May 3, 1992, *with light duty restrictions.* (Tr. 186) (emphasis added).

On May 14, 1992, when Dr. Kolstad next saw plaintiff, she was working in a light-duty capacity, not involving more than two hours of keypunching. (Tr. 187). Three

---

10. This refers to an abnormally decreased sensation of the skin. *Dorland's Medical Dictionary* 749 (25th ed.1974).

months later, in August, 1992, plaintiff indicated that she still had discomfort in the right hand and was doing very little typing. Dr. Kolstad observed a small mass at the base of her right thumb. He gave her a five percent (5%) permanent partial disability rating to the right hand, based on the carpal tunnel syndrome and incomplete relief following carpal tunnel release. He awarded the same with regard to the left hand and a one percent (1%) permanent partial disability rating to the right hand as a result of a ganglion [11] and tenosynovitis that was persistent to the right thumb. *Id.*

In April, 1993, plaintiff reported to Dr. Kolstad that she was working and using a keyboard for about two hours a day. She was experiencing increasing tightness in the thumb with occasional numbness in her fingers and swelling at the end of the day. She was using a splint at work. Dr. Kolstad was of the opinion that she had tenosynovitis related to her work and mild recurrent carpal tunnel syndrome. He recommended that she proceed with warm soaks twice a day, night splints, and 200 mg. of Advil at the end of the day. (Tr. 188).

A year later, in April, 1994, plaintiff reported that she was still working full time, typing two hours a day, although frequently more. She indicated that she had had "minimal and occasional intermittent discomfort for the past year," which had been growing worse for the past two months. She described nighttime awakening with numbness in her fingers, which improved with the use of splints. She was experiencing numbness during the day and pain in her thumbs. Dr. Kolstad's examination revealed tenderness over the proximal pulley to the thumb and tenderness on grinding to the first CMC joint.[12] X-rays were taken, which revealed degenerative changes bilaterally of the CMC joint. Dr. Kolstad stated that he believed her work exacerbated her osteo-arthritic condition. Dr. Kolstad gave her a right CMC splint, and prescribed Relafen, Vitamin $B_6$ and warm soaks. (Tr. 189).

On May 5, 1994, plaintiff returned with complaints of swelling due to the medication, pain in her right thumb and intermittent numbness in the fingers with varied activities during the day and after typing. (Tr. 190). The following month when she saw Dr. Kolstad, she reported similar symptoms. He was of the opinion that she had degenerative disease of both first CMC joints, "aggravated by her work," with the greatest difficulty on her left hand. *Id.* He gave her a Xylocaine and Celestone injection of the left carpal tunnel. *Id.* Three weeks later, plaintiff reported that the injection had not helped and complained of primarily thumb pain and intermittent numbness into her fingers. He examined her hands and injected the flexor tendon sheath to the thumb with Xylocaine and Celestone. Dr. Kolstad noted that plaintiff was continuing to work full-time in a *"restricted, i.e., 1 to 2 hour typing capacity."* (Tr. 191) (emphasis added). In July, 1994, because of plaintiff's continued complaints of pain, Dr. Kolstad recommended release of the flexor halluces longus, rather than a re-release of the carpal tunnel. Plaintiff,

---

11. Ganglia are cystic swellings occurring on the hands, especially on the dorsal aspect of the wrists. They are found near or attached to tendon sheaths and joint capsules. Most ganglia do not require treatment but if the ganglion is painful or tender, aspiration with or without injection of a corticosteroid may be used. A small percentage ultimately require surgical excision. *The Merck Manual* 493 (17th ed.1999).

12. "CMC" refers to the carpometacarpal joint, which is the joint between the wrist and fingers.

however, did not want any treatment at that time. *Id.*

In August, 1994, plaintiff began experiencing numbness in her arms, which Dr. Kolstad believed was secondary to the carpal tunnel syndrome. He suggested night splinting. (Tr. 192). In October, plaintiff presented with pain and swelling at the base of her thumb caused by a small cyst. She was also having numbness in her hands. *Id.* Dr. Kolstad again recommended surgical release of the proximal pulley to the right thumb. *Id.*

Again, we do not have his operative notes, but on December 19, 1995, Dr. Kolstad reports that he saw plaintiff following synovectomy.[13] "There was ganglion excision and release of the proximal pulley." (Tr. 193). He saw her in early January and again in late January, 1996, at which time he reported that she had full flexion and that she would be reporting back to work in the next week, full time, regular duty. *Id.*

In February, Dr. Kolstad saw plaintiff and reported that she was doing quite well, having returned to work in her usual capacity, *"which includes a restriction of 2 hours of typing."* (Tr. 194) (emphasis added). He was of the opinion that she had reached maximum medical improvement. *Id.* In May, plaintiff returned complaining of pain in her right thumb, pain when holding a pencil and pain going up her arm. On examination, Dr. Kolstad reported that the first CMC joint was the most tender. X-rays showed mild degenerative changes. He injected the CMC joint, which provided plaintiff with "good relief" for three or four days, but then the pain returned. She also experienced occasional numbness in her hands, numbness when driving and doing other activities. (Tr. 194). Dr. Kolstad discussed with her various surgical options, including fusion, implant or interposition arthroplasty of the first CMC joint. She did not feel that the pain warranted any of these options. (Tr. 195).

The next notes that we have from Dr. Kolstad are more than a year later, dated August 26, 1997. Plaintiff reported having pain in her wrist and elbow and numbness in her fingers. She had been unable to sleep. She had been taking 600 mg. Motrin twice a day, which did not alleviate her symptoms. Dr. Kolstad stated that she had a positive Phalen's test into the medial nerve distribution. He believed she was suffering from recurrent carpal tunnel syndrome for which he gave her a corticosteroid injection. (Tr. 196). On September 16, 1997, plaintiff reported that she had achieved some relief from the injection but that she was still having tingling in her hand which radiated up her arm. X-rays demonstrated advanced degenerative disease of the first CMC joint. Dr. Kolstad recommended a number of different treatment options, which she declined at that time, and he also referred her for a rheumatological consultation. *Id.*

Plaintiff returned to Dr. Kolstad on October 20, 1997, with complaints of pain in her right thumb. She stated that she could not pick up things and that she experienced stiffness and intermittent numbness into her right hand, as well as pain and stiffness on her left. Dr. Kolstad did not find any atrophy to her thumb but noted mild swelling in the area. He again discussed treatment options with her and injected her thumb with Celestone and Marcaine, which provided immediate relief. He gave her a leather splint to immobilize the CMC joint and sent her for EMG and nerve conduction studies for her increasing

---

**13.** "Synovectomy" is the excision of a synovial membrane of a joint to help preserve joint function. *The Merck Manual* 422 (17th ed. 1999).

complaints of numbness, which he believed to be attributed to her carpal tunnel syndrome. (Tr. 197). These are the last records that we have from Dr. Kolstad.

On October 8, 1999, plaintiff underwent a consultative physical examination with Dr. Mallick Alam, at the behest of the Commissioner. Her chief complaints were of bilateral hand pain and lower back pain. He observed tenderness around both her wrist and the right thenar eminence,[14] with swelling. He reported that plaintiff demonstrated reduced range of motion in her right thumb in all movements with weakness against resistance. The rest of her upper extremity joints had full range of motion with normal strength and normal grip strength in both hands. (Tr. 260). His impression was obvious weakness in the right thumb strength and decrease in range of motion. (Tr. 261).

Office notes of Dr. Norman R. Kaplan, an orthopedic specialist, dated January 21, 2000, note that plaintiff had significant swelling at the base of the CMC joint on the right thumb, where plaintiff reported pain. She had decreased range of motion and strength at 15%. X-rays showed significant arthritis at this joint. (Tr. 324).

## VI. Whether There is Substantial Evidence to Support the ALJ's Determination That Plaintiff Could Perform Other Work

▮▮▮ In reaching his conclusion that plaintiff retained the ability to perform other work existing in the national econo-

my, the ALJ appropriately utilized testimony from a vocational expert, Dr. Blank.[15] See Rosa v. Callahan, 168 F.3d 72, 77, 82 (2d Cir.1999); SSR 96–9P, 1996 WL 374185, at *9. However, "[i]n order for the testimony of a vocational expert to be considered reliable, the hypothetical posed must include all of the claimant's functional limitations, both physical and mental supported by the record." Flores v. Shalala, 49 F.3d 562, 570–71 (9th Cir.1995); see Arocho v. Secretary of Health and Human Services, 670 F.2d 374, 375 (1st Cir.1982). In this case, the ALJ relied on Dr. Blank's response to his second hypothetical question, which presented a claimant with plaintiff's background, who was limited to performing sedentary work with the need for a low-stress, supervised environment (requiring few decisions), and also restricted against heights, vibrations, and dangerous machinery. The vocational expert testified that this person could not return to plaintiff's previous job, but she would be able to perform work existing in the national economy, specifically, small parts assembly, visual inspecting positions and testing positions. (Tr. 50). The hypothetical posed by the ALJ, however, did not take into account in any manner whatsoever the manipulative limitations caused by plaintiff's carpal tunnel syndrome and the decreased range of motion and diminished strength in her right thumb, which are discussed at length in Dr. Kolstad's records.

---

14. The "thenar eminence" is the mound on the palm at the base of the thumb. Dorland's Medical Dictionary 1594 (25th ed.1974).

15. Where an individual, who is limited to unskilled sedentary jobs, possesses additional, significant nonexertional limitations, the assistance of a vocational expert is generally required to testify concerning the effect these nonexertional limitations have on the occupational base. The vocational expert may be asked to provide an analysis of the impact of the claimant's RFC upon the full range of sedentary work, examples of occupations the claimant may be able to perform, and citations to the existence and number of jobs in such occupations in the national economy. SSR 96–9P, 1996 WL 374185, at *9; see Carolyn A. Kubitschek, Social Security Disability Law and Procedure in Federal Court § 3:52, at 177 (1994).

The Commissioner argues that Dr. Kolstad's findings are indicative of degenerative changes in her wrists and not within her fingers themselves. She further contends that Dr. Kolstad's records show that plaintiff enjoyed a good range of motion in her fingers and thumb and, therefore, any functional limitations did not stem from her fingers or hands. (Def.'s Mem. at 13–14). We disagree.

Beginning with plaintiff's earliest visits to Dr. Kolstad, his records reflect that plaintiff could not perform keypunching or typing for more than two hours. Repeatedly he referred to the need for her to work in a light-duty capacity, which involved no more than two hours of typing or keypunching. *See, e.g.,* Tr. 182, 183, 185, 186, 189, 191, 194. In late 1991, following her surgeries, he opined that "it may well eventuate that the patient is not able to return to any job that requires significant typing or keypunching." (Tr. 182); *see also* (Tr. 184, 185). In 1992, he gave her a permanent partial disability rating of five percent (5%) to her right hand and to the left hand, plus a one percent (1%) permanent partial disability rating to the right hand due to the ganglion and tenosynovitis that persisted in her right thumb. (Tr. 187). In 1994, he described her degenerative disease of both first CMC joints as aggravated by her work, and continued to restrict her typing to one to two hours per day. (Tr. 191). In 1996, after surgical releases of the carpal tunnel and several corticosteroid injections, a ganglion incision and release of the proximal pulley in her right thumb, plaintiff was still complaining of numbness and pain in the right thumb and pain when holding a pencil. Her complaints were

severe enough that Dr. Kolstad discussed with her various options including fusion, implant or interposition arthroplasty of the first CMC joint. He reported that plaintiff had reached maximum medical improvement and again continued the restrictions on her ability to type or keypunch. (Tr. 194). In 1997, plaintiff was still experiencing stiffness and pain in her right and left hands as a result of recurrent carpal tunnel syndrome, which he treated with additional corticosteroid injections and for which he gave plaintiff a splint. X-rays showed "advanced degenerative disease of the first CMC joint," which represented a progression from earlier X-rays. Plaintiff complained that she could not pick up things. (Tr. 196–97).

Dr. Alam, who performed a consultative examination of plaintiff, observed tenderness around both her wrist and the right thenar eminence, with swelling. He reported that plaintiff demonstrated reduced range of motion in her right thumb in all movements with weakness against resistance. The rest of her upper extremity joints had full range of motion with normal strength and normal grip strength in both hands. (Tr. 260). His impression was obvious weakness in the right thumb strength and decrease in range of motion. (Tr. 261).

Dr. Kaplan, whom plaintiff saw following her automobile accident, described a severely arthritic right thumb CMC joint, with decreased range of motion and strength at 15%. (Tr. 324).

Fingering, as is required for keyboarding and typing, is a nonexertional impairment.[16] "Most sedentary jobs require

16. Nonexertional capacity considers any work-related limitations and restrictions that are not exertional, *i.e.,* caused by sitting, standing, walking, lifting, carrying, pushing, and pulling. Thus, nonexertional limitations are impairment-caused limitations affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching,

good use of the hands and fingers" for fine movements such as picking, pinching, holding, grasping, and turning. SSR 96–9P, 1996 WL 374185, at *8; *see Rosa v. Callahan,* 168 F.3d at 82.[17]

Dr. Kolstad's reports provide objective medical evidence that plaintiff's ability to use her hands to perform fine motor functions such as typing and keypunching is substantially limited. They also indicate that plaintiff's ability to use her thumb on her right, dominant hand is limited due to the advanced degenerative disease of the CMC joint. The loss of strength and limited range of motion of the right thumb are confirmed by the consultative examination of plaintiff. Plaintiff herself testified that she could not perform her job as a secretary or receptionist because of the problems with her hands, that she still experiences sharp pains in both hands, and that she cannot write for more than five minutes nor twist a doorknob with only one hand. Yet, none of these manipulative limitations were taken into account by the ALJ in his hypothetical to the vocational expert, on which he based his finding of "not disabled.".

Although the ALJ was not required to address every piece of evidence, he could not ignore the substantial evidence from plaintiff's treating physician that she had nonexertional limitations involving the use of her hands. These manipulative limitations should have been included in the hypothetical question posed to the vocational expert concerning whether there

were unskilled, sedentary jobs in the national economy that plaintiff could perform. Indeed, on cross-examination, the vocational expert stated that all three of the positions that he had suggested as possible jobs for plaintiff involved "fine motor coordination, fine motor movement." (Tr. 50). He then qualified his earlier response to the ALJ by stating that, if the plaintiff could not do keypunching for more than two hours in an eight-hour day because of fine motor limitations, then she could not do any of the jobs that he had just described. (Tr. 51). Whether there are other unskilled, sedentary jobs that plaintiff could perform is not answered by the record before us.

Because the ALJ's hypothetical, on which he based his finding of "not disabled," failed to incorporate a fair representation of plaintiff's medically diagnosed limitations, the court finds the disability determination is not supported by substantial evidence. *See Aguiar v. Apfel,* 99 F.Supp.2d 130, 138 (D.Mass.2000). Therefore, the decision of the Commissioner that plaintiff is not disabled is reversed.

## VII. Disposition

Because we are unable to determine from the record before us whether there is any other kind of substantial gainful employment existing in the national economy in which plaintiff could engage, we find that a remand is appropriate to allow the Commissioner to reconsider plaintiff's

---

*handling, fingering, and feeling.* SSR 96–9P, 1996 WL 374185, at *5 (emphasis added).

**17.** Indeed, the Medical–Vocational Guidelines provide an example of an individual under age 45 with a high school education, who can no longer do his past relevant work, and who is restricted to unskilled sedentary jobs because of a severe medically determinable cardiovascular impairment (which does not meet or equal the Listings). That individual also

has a permanent injury to the right hand which limits him to sedentary jobs that do not require bilateral manual dexterity. The Guidelines state that "[s]ince the inability to perform jobs requiring bilateral manual dexterity significantly compromises the only range of work for which the individual is qualified (*i.e.,* sedentary), a finding of disabled would be appropriate." 20 C.F.R. Pt. 404, Subpart P, App. 2, § 201.00(h) (Example 1).

claim in light of these additional limitations. 42 U.S.C. § 405(g); *see Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987); *Padilla v. Heckler,* 643 F.Supp. 481, 488 (S.D.N.Y.1986). Specifically, we remand this case pursuant to sentence four of § 405(g).[18] *See Raitport v. Callahan,* 183 F.3d 101, 103–04 (2d Cir.1999). The Commissioner is directed to re-examine the medical records in this case relating to plaintiff's nonexertional, manipulative limitations and to ascertain from the vocational expert whether, in light of these additional limitations, there are a significant number of other jobs in the national economy which plaintiff could perform. Plaintiff's counsel must be given an opportunity to review and respond to the opinion of the vocational expert. SSR 96–9P, n. 8, 1996 WL 374185, at *10; *see Rosa v. Callahan,* 168 F.3d at 82–83.

### *CONCLUSION*

Accordingly, plaintiff's motion to reverse or remand [**Doc. # 8**] is GRANTED. Defendant's motion to affirm [**Doc. # 10**] is DENIED. The Clerk shall enter judgment accordingly.

SO ORDERED.

---

18. Sentence four of § 405(g) provides:
The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.